Contractor's Crane Service, Inc. v. Vermont Whey Abatement Authority, Vermont Whey, Inc., State of Vermont, Cabot Farmers Co-operative Creamery, Inc., International Cheese Co., Inc., Lucille Farm Products, Inc., Wells River Creamery, Inc. and Kraft Foods, Inc.

[519 A.2d 1166]

No. 83-155

Present: Allen, C.J., Hill, Gibson and Hayes,* JJ., and Daley, J. (Ret.), Specially Assigned

Opinion Filed November 14, 1986

_____

* Justice Hayes heard oral argument but did not take part in the decision.

442

*Edward J. Tyler III* and *Steven W. Wechsler* of *Tyler, Bruce & Brooks*, St. Albans, for Plaintiff-Appellee.

*Gibson, Noble & Goodrich*, Montpelier, for Defendant-Appellant Cabot Farmers Co-operative Creamery, Inc.

*Edwin W. Free, Jr.*, of *Richard E. Davis Associates, Inc.*, Barre, for Defendant-Appellant International Cheese Co.

*Andrew R. Field*, Montpelier, for Defendant-Appellant Lucille Farm Products.

**Gibson, J.** This is an appeal of a judgment for plaintiff in a cause of action for breach of contract.[1] We affirm.

---

[1] Of all the named defendants, only four—Cabot Farmers Co-operative Creamery, International Cheese Company, Lucille Farm Products, and Wells River Creamery—filed notice of appeal. Of those, Wells River Creamery did not file a brief. A default judgment was entered against Vermont Whey. Summary judgments were entered in favor of the Vermont Whey Pollution Abatement Authority and

Liquid whey is a waste by-product of the manufacture of cheese. In years past, Vermont cheese producers disposed of their whey by discharging it into the ponds and streams of the state. This polluted those waters and ultimately "aroused widespread public concern." 1971, No. 83, § 2. Responding to this concern, the Legislature created the Vermont Whey Pollution Abatement Authority (Authority). See generally 10 V.S.A. ch. 57.

To dispose of whey in a nonpolluting manner, the Authority built a plant in Georgia, Vermont to convert the liquid material into a dry powder suitable to sell for human and animal consumption. The Authority leased the plant to the State of Vermont which in turn subleased it to four Vermont cheese producers—Cabot Farmers Co-operative Creamery (Cabot), Lucille Farm Products (Lucille), International Cheese Company (International Cheese), and Wells River Creamery (Wells River). These four companies (the defendants) formed a joint venture to sublease, and incorporated Vermont Whey to operate, the Georgia plant. Defendants also hired James Hinkel as manager of that facility.[2] All stock in Vermont Whey was owned by defendants, and its board of directors included the principal officer of each of the defendants.

Essential to the operation of the Georgia plant was a steady supply of whey. Defendants had the whey and needed to dispose of it. Since, however, their plants were spread around the state, transporting the whey to the Georgia facility was not a simple matter. Contemplating the eventual start-up of the whey-processing operation, Vermont Whey solicited bids for hauling the liquid to the plant. Plaintiff, Contractor's Crane Service, responded to such a solicitation and received confirmation from Mr. Hinkel that the bid had been accepted. Plaintiff thereafter acquired equipment to do the job and began hauling from the plants of Cabot, International Cheese, and Lucille to the plant in Georgia. Although Wells River was a joint venturer, plaintiff did not transport whey for it.

---

the State of Vermont. Plaintiff apparently never served a complaint on Kraft Foods or otherwise brought it in as a party.

[2] The record reveals conflicting evidence as to whether Hinkel remained defendants' employee or became Vermont Whey's employee. Although there was sufficient evidence to support a finding that he remained in defendants' employment, that determination would not affect the outcome of this appeal.

Due to a multitude of difficulties, the plant in Georgia began operation later than anticipated. Moreover, when Vermont Whey took charge of whey-processing in March of 1978, the company almost immediately encountered problems meeting obligations to its creditors, including plaintiff. In October 1978, the board of directors of Vermont Whey decided that defendants would periodically pay to Vermont Whey amounts equivalent to the bills for hauling whey from their respective plants. Vermont Whey, however, did not use the funds only to pay hauling expenses; rather, the money went toward all of its various operating expenses. Thus, the debt owed to plaintiff continued to grow.

Plaintiff maintained that, by February 1979, in excess of $168,000 in whey-hauling bills remained unpaid. At trial, plaintiff's president testified that Hinkel, the presidents of Lucille and International Cheese, and the general manager of Cabot had all assured him that defendants would see to it that these bills were paid. Ultimately, seeking to collect the money owed it, plaintiff brought suit against Vermont Whey and attached its inventory, that is, its whey. This precipitated another meeting of Vermont Whey's board of directors in February 1979. An apparent compromise resulted. Plaintiff released the inventory and continued hauling whey for Cabot, Lucille, and International Cheese. Thereafter plaintiff billed those three cheesemakers directly, and they paid their bills directly to plaintiff. All new bills were in fact paid for hauling after February 6, 1979. The debts at issue are those accumulating between March 11, 1978, when Vermont Whey began operating the Georgia plant, and February 6, 1979.

In August 1979, Vermont Whey ceased operating the whey-processing plant and became unable to pay its outstanding obligations. Plaintiff received a default judgment against Vermont Whey. The primary issue at trial, however, was whether defendants were also liable. The jury found that they were.

Plaintiff presented several independent theories of recovery. It maintained that defendants were liable to it as a third-party beneficiary. Also, it sought to prove that defendants had promised to pay Vermont Whey's debts, and that documents evidencing that promise satisfied the Statute of Frauds, 12 V.S.A. § 181(2). Alternatively, plaintiff presented independent theories that, even if no writing existed to satisfy 12 V.S.A. § 181(2), defendants had made an original promise which fell outside the requirements of the statute. The jury returned a general verdict against defendants,

finding them jointly and severally liable. It awarded plaintiff $54,491.90 for unpaid hauling charges and $25,893.00 in interest.

## I.

## A.

Defendants argue that they were entitled to a directed verdict because plaintiff failed to present sufficient evidence to support any of its theories of recovery. Because the jury returned a general verdict in plaintiff's favor, we are unable to determine which theory of liability the fact-finder found convincing. Neither party requested either a special verdict or a general verdict accompanied by answers to interrogatories. See V.R.C.P. 49. Nor did the court, on its own motion, present such questions to the jury.

"We [have] encourage[d] the trial court's use of jury interrogatories in cases with multiple . . . theories of recovery such as this." *Prouty* v. *Manchester Motors, Inc.*, 143 Vt. 449, 450 n.1, 470 A.2d 1152, 1153 n.1 (1983). In complex cases, this assists not only the jury's determination concerning liability but also our task of deciding whether legal error has undermined that determination.

Prior cases seem in conflict as to appellate review of the sufficiency of evidence to support a verdict when the jury returns a general verdict on multiple independent theories of recovery. In *Lincoln* v. *Emerson*, 137 Vt. 301, 404 .A.2d 508 (1979), the plaintiffs pleaded three counts of misrepresentation in the sale of a farm. This Court observed:

> Seemingly without objection, the case was submitted to the jury generally, without separation of the counts, interrogatories or special verdicts. Therefore, to avoid reversal, *the evidence must be sufficient to support each of the claims* of the plaintiffs, because otherwise the judgment could be based, in part, upon an erroneous finding.

*Id.* at 303, 404 A.2d at 510 (emphasis added).

More recently, in *Morris* v. *American Motors Corp.*, 142 Vt. 566, 459 A.2d 968 (1982), we stated:

> [I]n light of [defendant's] claim that the plaintiff failed to meet his burden, we are compelled to sift through the evidence to determine *if any single theory of liability was suf-*

*ficiently proved* to sustain the plaintiff's case. The jury's general verdict gives no clue as to which theory it found convincing, but general verdicts will be construed to give them effect if that can reasonably be done.

*Id.* at 572, 459 A.2d at 971 (emphasis added) (citation omitted).

The apparent conflict between *Morris* and the earlier *Lincoln* opinion presents us with an important question about the standard of our appellate review of a general verdict when multiple independent theories of liability have been presented to the jury. We conclude that *Morris* provides a more appropriate rule, and to the extent that *Lincoln* is inconsistent with our holding today, we overrule it. *Morris*'s treatment of this question is more in harmony with traditional analysis of the appellant's obligation of proving prejudicial error.

When the party seeking appellate reversal of a judgment against it has failed to request a special verdict or interrogatories which would shed light on the jury's treatment of multiple theories, that failure is significant. *Connelly Containers, Inc. v. Pennsylvania Railroad*, 222 Pa. Super. 7, 15-16, 292 A.2d 528, 532-33 (1972). The appellant normally bears the responsibility of providing a record which adequately demonstrates both error and prejudice. *Merrill v. Reed*, 123 Vt. 248, 256, 185 A.2d 737, 743 (1962) ("the excepting party must produce a record that makes it appear that harmful error was committed by the lower court"). That same obligation should apply in the present context.

■ We hold that in civil cases such as this, involving multiple independent theories of liability, defendants who lose at trial may attempt on appeal to establish prejudicial error in either of two ways: They must show error affecting all theories of recovery, or they must show error affecting an individual theory upon which the jury relied. Here, the defendants cannot do the latter, since they did not request a special verdict or interrogatories.[3] They must, accordingly, establish error that undermines all theories of liability submitted to the fact-finder. If any single theory of recovery is untainted by error, we will affirm the lower court's judgment.

---

[3] We do not here decide whether our treatment of this case would be different if defendants had requested a special verdict or interrogatories, and the court had denied their request. That question is not now before us.

## B.

As noted previously, one of plaintiff's theories of recovery was that defendants made an original promise to pay Vermont Whey's debts. Defendants have argued at trial and now on appeal that none of the documents submitted as exhibits in this case satisfy the Statute of Frauds, 12 V.S.A. § 181. The Statute applies to, inter alia, "[a] special promise to answer for the debt, default or misdoings of another." 12 V.S.A. § 181(2). An *original* promise, however, is unaffected by the Statute, and thus can be oral. *Enos* v. *Owens Slate Co.*, 104 Vt. 329, 333, 160 A. 185, 187 (1932).

The terms "original promise," to which the Statute does not apply, and "collateral promise," to which it does apply, are not self-defining. "These words are generally used to express a result and do not help in ascertaining which promises are enforceable." J. Calamari & J. Perillo, Law of Contracts 675 (2d ed. 1977). Contending that any promise they made to plaintiff was collateral rather than original, defendants invoke what, in *Conti* v. *Johnson*, 91 Vt. 467, 469, 100 A. 874, 875 (1917), this Court called the "general rule" that "a verbal promise to pay the debt of another . . . is collateral, if the debtor, after the promise is made, continues liable . . . ." The Court did not state, however, that *Conti*'s so-called "general rule" was without exceptions.

Defendants also remind us that in *Pike Industries, Inc.* v. *Middlebury Associates*, 136 Vt. 588, 593, 398 A.2d 280, 283 (1979), we said that a "new promise is original if it contemplates a discharge of the first contracting party and the substitution of the party involved in the new contract." We did not, however, state in *Pike Industries* that a promise is original *only* if it contemplates such a discharge and substitution.

Relying on *Conti* and *Pike Industries*, defendants insist that because Vermont Whey remained liable for its debt, a matter not disputed, any promises by defendants to pay those debts were, accordingly, collateral and thus governed by the Statute of Frauds. We disagree.

In *Fullam* v. *Adams*, 37 Vt. 391, 401 (1864), this Court noted the importance of a promisor's "leading purpose and object" in pledging to pay the debts of another. See also *Bellows* v. *Sowles*, 57 Vt. 164, 171 (1884) (referring to "the *principal* or *immediate* object of the promisor") (emphasis in original). This "main purpose" or "leading object" rule has been defined as follows:

When the leading object of the promise or agreement is to become guarantor or surety to the promisee for a debt for which a third party is and continues to be primarily liable, the agreement, whether made before or after or at the time of the promise of the principal, is within the statute, and not binding unless evidenced by writing. On the other hand, when the leading object of the promisor is to subserve some interest or purpose of his own, notwithstanding the effect is to pay or discharge the debt of another, his promise is not within the statute.

2 A. Corbin, Contracts § 366, at 273-74 (1950) (footnote omitted). The Second Restatement of Contracts offers this rationale for the rule:

Where the surety-promisor's main purpose is his own pecuniary or business advantage, the gratuitous or sentimental element often present in suretyship is eliminated, the likelihood of disproportion in the values exchanged between promisor and promisee is reduced, and the commercial context commonly provides evidentiary safeguards. Thus there is less need for cautionary or evidentiary formality than in other cases of suretyship.

Restatement (Second) of Contracts § 116, at 299 (1981). Where applicable, this rule can take a promise outside the requirements of 12 V.S.A. § 181(2).

In the record before us, there is ample evidence which, if believed by the jury, would have established that the joint venturers promised to pay Vermont Whey's debts owed to plaintiff. Plaintiff's president testified that the presidents of International Cheese and Lucille and the general manager of Cabot all told him that the joint venturers would pay Vermont Whey's debts for hauling whey. Based on these assurances, plaintiff provided consideration to defendants by helping them dispose of their whey in a legal, nonpolluting manner after Vermont Whey was in breach of its contract with plaintiff. Moreover, a fact-finder could reasonably have concluded that defendants' main purpose in promising to pay for the whey hauling was to enable them to continue disposing of their whey. Since there was sufficient evidence to support at least one of plaintiff's theories of recovery, for the reasons previously stated we need not address defendants' contention

that plaintiff failed to prove its other theories. Nor, for the same reasons, is it necessary to address defendants' contentions that the trial court erroneously instructed the jury on matters pertaining to those other theories.[4]

■ Defendants do, however, make an additional argument about the trial court's treatment of the Statute of Frauds theory. They contend that the court incorrectly instructed the jury about an exception to the Statute. The court charged that if a party relies on an oral promise, fully performing its end of the bargain, then a written promise is not required if it would be fraud to allow the promisor to deny the contract. This instruction was not error; it accurately stated a legal principle. *Nichols* v. *Nichols*, 139 Vt. 273, 277, 427 A.2d 374, 377 (1981).

Defendants also argue that this principle was inapplicable because plaintiff did not plead fraud and because the court did not instruct that fraud must be proved by clear and convincing evidence. The law does not require that a party seeking to enforce such an oral promise prove fraud; "rather, he must show 'that acts of his, done in reliance on the agreement, known to the defendant, so altered the relations of the parties as to prevent restoration to their former condition.' " *Id.* at 277-78, 427 A.2d at 377 (quoting *Towsley* v. *Champlain Oil Co.*, 127 Vt. 541, 543, 254 A.2d 440, 442 (1969)).

## II.

At trial, defendants repeatedly tried to cross-examine plaintiff's president about the contents of the pleadings in the suit commenced in February 1979 against Vermont Whey. Defendants contend that the pleadings show that plaintiff's prior position as to who was liable to plaintiff was different from the theory presented at trial. In essence, defendants maintain that plaintiff's failure to include the joint venturers as defendants in the initial cause of action tended to prove plaintiff had not initially believed that defendants had breached a duty to it.

---

[4] We note, although none of the parties specifically objected to it, that the court instructed the jury that defendants' purported promise to pay Vermont Whey's debts was original if, based on the promise, plaintiff continued hauling whey "solely for the defendants' benefit." This instruction may have been misleading, since it tended to suggest a "sole purpose" rather than "main purpose" rule. This could in no way have been prejudicial to defendants, however, since such an incorrect rule would have been more, not less, favorable to them.

The 1979 pleadings were drafted by an attorney other than the one who represented plaintiff in its suit against defendants. Upholding plaintiff's objection to defendants' attempted use of these documents, the trial court stated that the history of the pleadings was "too collateral." Moreover, the court reasoned that commencing an action against one party showed a belief that the party was liable, but it did not amount to an acknowledgement that other unnamed parties had no liability.

"The scope of cross-examination of a party is within the discretion of the trial judge . . . ." *Peter Gallerani & Sons, Inc.* v. *State Highway Board*, 133 Vt. 485, 487, 346 A.2d 529, 531 (1975) (citation omitted). The trial court's decision was well-reasoned. It weighed the marginal probativeness of the pleadings and their tendency to introduce remote, collateral considerations that could confuse the jury. The court's ruling was not an abuse of discretion.

■ Our holding here is in no way a retreat from our statement in *My Sister's Place* v. *City of Burlington*, 139 Vt. 602, 614, 433 A.2d 275, 282 (1981), that "original pleadings, though later revised, are generally admissible against the party filing the pleadings as an admission against interest." Even though evidence is otherwise admissible, the trial court may exclude it where, as in the present case, the court determines that the evidence's "probative value is substantially outweighed by the danger of . . . confusion of the issues . . . ." V.R.E. 403.

### III.

Defendants also argue that the court erred in admitting two of defendants' exhibits, numbers 10 and 28, as evidence. The exhibits were letters written by an attorney who represented not only the defendants but also Vermont Whey. One letter, written on defendants' behalf, informed the secretary of the Vermont Agency of Development and Community Affairs that defendants were "assuming the cost of transporting whey from their plants to the Georgia plant . . . ." The second letter, written on the attorney's own stationery, was addressed to the principal officer of each of the four joint venturers. In it the attorney stated that "it was [his] understanding that individual Joint Venturers did not intend that creditors of Vermont Whey would be left without payment of their accounts."

Defendants' sole argument against these letters is that they were hearsay and that their use as evidence violated V.R.E. 801 and 802.[5] They do not assert that the letters fell within the protection of the attorney-client privilege of V.R.E. 502; so we need not explore that question. We address the narrow inquiry whether the letters were hearsay.

When a statement is offered against a party in litigation, it is treated as an admission and is thus not hearsay if it is "a statement by his agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship . . . ." V.R.E. 801(d)(2)(D). "Statements made by an attorney concerning a matter within his employment may be admissible against the party retaining the attorney." *United States* v. *Margiotta*, 662 F.2d 131, 142 (2d Cir. 1981) (applying Fed. R. Evid. 801(d)).

Plainly, the attorney's letter on defendants' behalf to the secretary fit within the terms of V.R.E. 801(d)(2)(D). It, accordingly, was not hearsay.

The nature of the attorney's letter to defendants is, however, less clear. This is because Vermont Whey and defendants shared some of the same agents. Lines of agency were sometimes blurred. At times, certain persons acted as agents for Vermont Whey and defendants at the same time. For example, at Vermont Whey's board of directors meetings, defendants' respective presidents would, while acting as board members, commit the whey processor to a course of action and, at the same time, acting as defendants' principal officers, obligate the cheese producers to contribute additional funds to keep Vermont Whey solvent. Likewise, the lower court could reasonably have concluded that the attorney was an agent for Vermont Whey *and* defendants when he wrote his letter.

If in fact the attorney was not representing defendants when he wrote this second letter, then defendants have failed to provide us with a record establishing that fact. As we stated previously, as appellants they bear the burden of providing a record which establishes prejudicial error. *Merrill* v. *Reed, supra*, 123 Vt. at 256,

[5] Although noting that the Vermont Rules of Evidence became effective several weeks after the trial in this case, we will address defendants' argument as it has been presented, i.e., under the Rules. Plaintiff has raised no objection to the applicability of these Rules of Evidence, although it notes they were "not technically in effect."

185 A.2d at 743. On the record before us, we conclude that the trial court did not err.

## IV.

Finally, defendants argue that the trial court erred in instructing the jury about the duties of a dissenting director at board meetings. The instruction to which defendants object apparently came from 11 V.S.A. § 1891(b), as it was a verbatim recitation of all but the last sentence of that provision.

At trial, defendants merely stated that the instruction might cause "confusion" and could use "clarification." On appeal, however, defendants argue that the instruction raised an "issue [that] was irrelevant and the instruction was erroneous." Thus, at trial defendants stated that the instruction as given might confuse the jury, but on appeal they argue that it was wholly inappropriate.

"The objection to the trial court's charge must, of course, relate to the claim of error on appeal." *Palmisano* v. *Townsend*, 136 Vt. 372, 374, 392 A.2d 393, 395 (1978); see also *Lincoln* v. *Emerson, supra*, 137 Vt. at 305, 404 A.2d at 511. In failing to present their objection to the trial court, defendants have not preserved the issue for review on appeal.

The concern expressed was that the jury might interpret the instruction to mean that a corporate president for one of the defendants, sitting as a director at a Vermont Whey board meeting, might, by failing to dissent to the board's actions, thereby obligate his own corporation. We note, however, that the trial court also instructed the jury:

> In general, the shareholders or directors of a corporation are not responsible for the corporation's debts. Merely because they own, or serve as directors of, the corporation, any debt the corporation is responsible for must be paid out of the corporation funds and not out of funds of the individual shareholder or directors.

Viewed in its entirety, the charge to the jury does not suffer from the infirmity that defendants allege. Thus, even if an objection to the charge were properly before us, it would lack merit.

*Affirmed.*