# William C. Brueckner, Jr. v. Norwich University

[730 A.2d 1086]

No. 97-396

Present: **Amestoy, C.J., Dooley, Morse, Johnson and Skoglund, JJ.**

Opinion Filed February 5, 1999

Motion for Reargument Denied March 10, 1999

*Richard T. Cassidy, Richard H. Thomas* and *Kerin Stackpole* of *Hoff Curtis Pacht Cassidy & Frame, P.C.*, Burlington, for Plaintiff-Appellee.

*Allan R. Keyes* and *John A. Serafino* of *Ryan Smith & Carbine, Ltd.*, Rutland, and *Arthur Makadon, Walter M. Einhorn, Jr.,* and *Courtney L. Yeakel* of *Ballard Spahr Andrews & Ingersoll*, Philadelphia, Pennsylvania, for Defendant-Appellant.

**Amestoy, C.J.** Norwich University appeals from the denial of its post-trial motions for judgment as a matter of law, or in the alternative, for a new trial, following a jury verdict finding it liable and awarding compensatory and punitive damages on several tort claims arising from incidents of hazing suffered by plaintiff while a freshman. Norwich University raises numerous issues with respect to its liability, the award of lost earnings damages, and the award of punitive damages. We affirm the court's rulings on liability and lost earnings damages, but reverse the award of punitive damages because there was an insufficient showing of malice to support the award.

Viewing the evidence in the light most favorable to the plaintiff, as we must on the appeal of both a motion for judgment as

a matter of law, see *Silva v. Stevens*, 156 Vt. 94, 101-02, 589 A.2d 852, 856 (1991), and a motion for a new trial, see *Lent v. Huntoon*, 143 Vt. 539, 552, 470 A.2d 1162, 1170 (1983), the facts are as follows. In August 1990, plaintiff William C. Brueckner, Jr. arrived as an incoming freshman, or "rook," at the Military College of Vermont of Norwich University (Norwich). At the time, he was a twenty-four year old, five-year veteran of the United States Navy, having been awarded a four-year naval ROTC scholarship in the amount of $80,000 to attend Norwich. Under the authority and training of Norwich and its leadership, certain upperclassmen were appointed by the university to indoctrinate and orient the incoming rooks, including plaintiff. These upperclassmen were known as the "cadre."

Plaintiff attended Norwich for only sixteen days as a result of his subjection to, and observation of, numerous incidents of hazing. In those sixteen days, plaintiff withstood a regular barrage of obscene, offensive and harassing language. He was interrogated at meals and thereby prevented from eating. He was ordered to disrobe in front of a female student, although he did not follow the order. He was prevented from studying during some of the assigned study periods and, on several occasions, cadre members destroyed his academic work with water. Members of the cadre also forced him to squat in the hall as they squirted him with water. He was forced to participate in unauthorized calisthenic sessions, despite an injured shoulder. He was slammed into a wall by a cadre member riding a skateboard in the hall. After cadre members vandalized his room by dumping water in it, plaintiff was ordered to clean up the mess. On two occasions, plaintiff was prevented from attending mandatory ROTC study hall on time, leading him to believe his scholarship status was endangered. One morning, as plaintiff walked along the corridor in the dormitory, he encountered two cadre members, one of whom asked plaintiff where plaintiff's name tag was. When plaintiff responded that he had forgotten it, one cadre member hit plaintiff hard in the shoulder, which was injured and in a sling. After the other cadre member told the hitter to stop, the hitter struck plaintiff again in the same shoulder, causing pain and bruises. After reporting the hazing problems to Norwich officials, plaintiff left the campus, believing that his situation would not improve. He returned briefly once more, then withdrew from Norwich, his scholarship terminated. Norwich investigated plaintiff's complaints and, as a result, several cadets were disciplined.

Plaintiff brought this action against Norwich for assault and battery, negligent infliction of emotional distress, intentional infliction

of emotional distress and negligent supervision. By means of special interrogatories, the jury found Norwich liable on all counts and awarded plaintiff $100,000 for emotional distress, $8,600 for medical expenses, $80,000 for the lost four-year college scholarship and $300,000 to cover lost earnings (past and future). The jury also awarded $1.75 million in punitive damages. The court denied Norwich's post-trial motions for judgment as a matter of law and for a new trial. Norwich appeals.

## I. Norwich's Liability

Norwich challenges the court's denial of its motion for judgment as a matter of law on each of plaintiff's theories of liability. We find no error.

■ Judgment as a matter of law may be granted where "there is no legally sufficient evidentiary basis for a reasonable jury to find for [the nonmoving] party." V.R.C.P. 50(a)(1), (b). Under the rule, a trial court considers the evidence "in the light most favorable to the nonmoving party, excluding the effect of any modifying evidence." *Lussier v. North Troy Eng'g Co.*, 149 Vt. 486, 490, 544 A.2d 1173, 1176 (1988). If evidence exists that may fairly and reasonably support all elements of the nonmoving party's claim, judgment as a matter of law is improper. On appeal from a denial or grant of judgment as a matter of law, this Court also views the evidence in the light most favorable to the nonmoving party and excludes the effects of any modifying evidence. See *Center v. Mad River Corp.*, 151 Vt. 408, 413, 561 A.2d 90, 93 (1989). The question is whether the result reached by the jury is "sound in law on the evidence produced." *Kinzer v. Degler Corp.*, 145 Vt. 410, 412, 491 A.2d 1017, 1018 (1985).

### A. Vicarious Liability — Assault and Battery, Intentional and Negligent Infliction of Emotional Distress

#### i. Vicarious Liability

Norwich claims error in the court's entry of judgment on the claims of assault and battery, as well as negligent and intentional infliction of emotional distress, because those claims are premised on acts of the cadre members that were not authorized and did not occur within the scope of their employment. Norwich claims it should not be held vicariously liable for the cadre's hazing.

■ Under the settled doctrine of respondeat superior, an employer or master is held vicariously liable for the tortious acts of an

employee or servant committed during, or incidental to, the scope of employment. See *Anderson v. Toombs*, 119 Vt. 40, 44-45, 117 A.2d 250, 253 (1955); *Poplaski v. Lamphere*, 152 Vt. 251, 257, 565 A.2d 1326, 1330 (1989). Norwich concedes that cadre members acted as its agents in "indoctrinating and orienting" rooks such as plaintiff. Norwich claims, however, that the tortious acts complained of were not committed within the cadre members' "scope of employment." Whether a given act is committed within the scope of employment is properly determined by the finder of fact after consideration of the attendant facts and circumstances of the particular case. See *Anderson*, 119 Vt. at 48, 117 A.2d at 254.

■ To be within the scope of employment, conduct must be of the same general nature as, or incidental to, the authorized conduct. See Restatement (Second) of Agency § 229(1) (1958). Conduct of the servant falls within the scope of employment if: (a) it is of the kind the servant is employed to perform; (b) it occurs substantially within the authorized time and space limits; (c) it is actuated, at least in part, by a purpose to serve the master; and (d) in a case in which the force is intentionally used by the servant against another, it is not unexpectable by the master. See *id.* § 228(1). Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time and space limits, or too little actuated by a purpose to serve the master. See *id.* § 228(2).

Here, the cadre were authorized by Norwich to indoctrinate and orient rooks through activities performed at various times of the day and night. A jury could reasonably find members of the cadre were acting in furtherance of their general duties to indoctrinate and orient the rooks and thus within their "scope of employment" at the time of the hazing incidents of which plaintiff complains.

Norwich argues that, because it had adopted policies against hazing and had instructed the cadre to refrain from mistreating the rooks, the tortious conduct was outside the scope of employment. Norwich contends that *McHugh v. University of Vermont*, 966 F.2d 67 (2d Cir. 1992), supports this result. In *McHugh*, the Second Circuit Court of Appeals, applying Vermont law, concluded that an employee who sexually and religiously harassed a fellow employee was not acting within the scope of employment. There, a major in the United States Army and an employee at the University of Vermont's Department of Military Studies told plaintiff, a female secretary, that his definition of a "secretary" was a "paid whore." The employee repeatedly joked about plaintiff contracting AIDS, stating that he

hoped she would be able to avoid infection. The employee also told plaintiff that it was "a good day to watch Catholic babies burn." *Id.* at 68-69. The court rejected the argument that the employee's conduct was within his scope of employment because it was within that scope for him to talk with the plaintiff, either to give instructions or to avoid the awkwardness of silence at work. It held: "It can hardly be contended that [the employee's] alleged conduct furthered the business" of his employer. *Id.* at 75.

■ The same cannot be said of this case, where the actions involved in hazing rooks may fairly be seen as qualitatively similar to the indoctrination and orientation with which the cadre members were charged. Indeed, Norwich described some of the acts of which plaintiff complained, such as forced calisthenics and questioning at mealtime, as not far removed from the official system of military discipline and training which recruits are expected to endure. The evidence supported the jury's conclusion that the cadre members were acting within the scope of employment. See *Belanger v. Village Pub I, Inc.*, 603 A.2d 1173, 1179 (Conn. App. Ct. 1992) (under doctrine of respondeat superior, employee's failure to follow employer's orders would not relieve employer of liability for employee's tortious conduct if employee acted with apparent authority in furtherance of employer's business).

### ii. Assault and Battery

Norwich next claims that there was insufficient evidence to support plaintiff's claim for assault and battery and thus, that the court erred when it denied Norwich judgment as a matter of law. Norwich concedes that an assault and battery occurred, but claims that vicarious liability cannot be established because insufficient evidence exists to identify the assailant as a member of the cadre. At trial, plaintiff could not recall whether the person who had struck him in the shoulder was a member of the cadre, but testified that he knew the assailant was not a rook and thought he was a member of the senior class. Plaintiff's counsel stressed in closing argument that, although plaintiff's memory failed him at trial, a report prepared in connection with plaintiff's case contained his earlier statement to his roommate that the hitter had been a cadre member. Norwich claims that the identification in the report is triple hearsay and amounts to "conjecture, surmise or suspicion," (quoting *Burlson v. Caledonia Sand & Gravel Co.*, 127 Vt. 594, 597, 255 A.2d 680, 682 (1969)), which is inadequate as a matter of law to support the jury's verdict.

■ There is no absolute prohibition against the use of admitted hearsay evidence to support a jury's verdict. See *In re M.P.*, 133 Vt. 144, 146, 333 A.2d 116, 118 (1975). Particularly in light of the fact that Norwich commissioned the report and moved for its introduction at trial, it cannot complain of the jury's consideration of a statement recorded therein. Notwithstanding plaintiff's memory lapse at trial, the jury reasonably could have concluded that plaintiff's earlier statement accurately recorded the attacker's identity. The court correctly denied the motion for judgment as a matter of law.

### iii. Negligent Infliction of Emotional Distress

■ Norwich claims that it was error for the court to uphold the jury's finding of liability for the claim of negligent infliction of emotional distress. To establish a claim for negligent infliction of emotional distress, a plaintiff must make a threshold showing that he or someone close to him faced physical peril. See *Francis v. Gaylord Container Corp.*, 837 F. Supp. 858, 864 (S.D. Ohio 1992), *aff'd*, 9 F.3d 107 (6th Cir. 1993). The prerequisites for establishing a claim differ according to whether plaintiff suffered a physical impact from an external force. See *Kingston Square Tenants Ass'n v. Tuskegee Gardens, Ltd.*, 792 F. Supp. 1566, 1576-77 (S.D. Fla. 1992). If there has been an impact, plaintiff may recover for emotional distress stemming from the incident during which the impact occurred. See *id.* If plaintiff has not suffered an impact, plaintiff must show that: (1) he was within the "zone of danger" of an act negligently directed at him by defendant, (2) he was subjected to a reasonable fear of immediate personal injury, and (3) he in fact suffered substantial bodily injury or illness as a result. See *Vaillancourt v. Medical Ctr. Hosp. of Vermont*, 139 Vt. 138, 143, 425 A.2d 92, 95 (1980).

■ In this case, plaintiff withstood at least two incidents of physical impact by a cadre member. Plaintiff testified about the fear of personal injury he felt in connection with a cadre member's careening down the dormitory hallway on a skateboard and "plowing" into rooks. On one such occasion, the cadre member ran into plaintiff. Plaintiff also testified as to the fear and apprehension he felt when struck twice in the shoulder he had previously injured. Plaintiff's doctor testified that plaintiff suffered from post-traumatic-stress disorder and a major depressive disorder as a result of his perception that he was at risk of serious physical injury during the incidents just

described. The evidence at trial fairly and reasonably supported the jury's verdict on negligent infliction of emotional distress.[1]

## B. Direct Liability — Negligent Supervision

Norwich argues it was not liable to plaintiff for negligent supervision of the students in the cadre because it owed no duty of care to plaintiff. Norwich's claim is premised on the fact that the hazing in question came at the hands of fellow students. It cites *Smith v. Day*, 148 Vt. 595, 599, 538 A.2d 157, 159 (1987), for the proposition that Norwich owed no duty to control the actions of Norwich students for the protection of plaintiff. We disagree because, unlike the *Smith* case, Norwich specifically charged cadre members with "indoctrinating and orienting" plaintiff.

A principal may, in addition to being found *vicariously* liable for tortious conduct of its agents, be found *directly* liable for damages resulting from negligent supervision of its agents' activities. See *Trahan-Laroche v. Lockheed Sanders, Inc.*, 657 A.2d 417, 419 (N.H. 1995); *Mainella v. Staff Builders Indus. Servs., Inc.*, 608 A.2d 1141, 1145 (R.I. 1992) (direct liability for negligent supervision of employees or agents constitutes an entirely separate and distinct type of liability from vicarious liability under respondeat superior); Restatement (Second) of Agency § 213. Norwich's claim that it owed no duty to plaintiff under the circumstances of this case fails under these established principles. Under the Restatement, "[a] person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligent or reckless . . . in the supervision of the activity." *Id.* According to the Restatement's drafters, § 213 "is a special application of the general rules stated in the Restatement of Torts . . . . Liability exists only if all the

---

[1] In light of our affirmance of liability for negligent infliction of emotional distress, and Norwich's failure to request a verdict form distinguishing between the two theories of emotional distress liability, we need not reach Norwich's claim of error concerning intentional infliction of emotional distress. See *Contractor's Crane Serv., Inc. v. Vermont Whey Abatement Auth.*, 147 Vt. 441, 446, 519 A.2d 1166, 1171 (1986). ("[I]n civil cases . . . involving multiple independent theories of liability, defendants who lose at trial may attempt on appeal to establish prejudicial error in either of two ways: They must show error affecting all theories of recovery, or they must show error affecting an individual theory upon which the jury relied. Here, the defendants cannot do the latter, since they did not request a special verdict or interrogatories. They must, accordingly, establish error that undermines all theories of liability submitted to the fact-finder. If any single theory of recovery is untainted by error, we will affirm the lower court's judgment.").

requirements of an action of tort for negligence exist." *Id.* cmt. a. In this instance, the cadre members, and by extension Norwich, owed plaintiff at minimum the duty to use reasonable care to avoid harming him. "One who engages in an enterprise is under a duty to anticipate and to guard against the human traits of his employees which unless regulated are likely to harm others. He is likewise required to make such reasonable regulations as the size or complexity of his business may require." *Id.* cmt. g. Norwich, therefore, owed plaintiff a duty of reasonable care in the control and supervision of the cadre.

In the instant case, the court correctly instructed the jury that Norwich owed plaintiff a duty to use reasonable care in avoiding harm to plaintiff, and the evidence in the record fairly and reasonably supports the jury's finding of liability.

## II. Actual Damages — The Jury's Lost Earnings Award

Norwich argues next that the trial court erred in failing to vacate the jury's award of $300,000 in lost earning capacity, and that the expert testimony offered to support the award was based on speculation and was therefore irrelevant and should not have been admitted. When reviewing a jury's award of damages, this Court must affirm the award "unless it appears to be clearly erroneous when the supporting evidence is viewed in the light most favorable to the prevailing party and any modifying evidence is disregarded." *Meadowbrook Condo. Ass'n v. South Burlington Realty Corp.*, 152 Vt. 16, 26, 565 A.2d 238, 244 (1989). Specifically, when a party appeals a court's refusal to set aside a verdict and grant a new trial on the grounds that the jury's verdict is not supported by the evidence, "[w]e need only determine 'whether the jury could reasonably have found its verdict for damages on the evidence before it.'" *Lorrain v. Ryan*, 160 Vt. 202, 209, 628 A.2d 543, 548 (1993) (quoting *Brunelle v. Coffey*, 128 Vt. 367, 370, 264 A.2d 782, 784 (1970)).

Viewed in the light most favorable to plaintiff, the evidence before the jury concerning lost earnings consisted of the following. Plaintiff graduated from high school and spent five years as an enlisted officer in the Navy. He consistently received high ratings by his superior officers, and he improved his aptitude examination rating during his time in the Navy. In 1990, his application for admission into the civil engineering program at Norwich was accepted, and he was granted a full four-year ROTC scholarship. Although plaintiff remained at Norwich only long enough to take one examination in the fall of 1990,

he performed satisfactorily. As a result of hazing, plaintiff withdrew from Norwich and thereafter worked a series of relatively low-paying jobs, culminating with his employment as a postal worker at the time of trial. He testified that he wished ultimately to complete college but, due to work and family pressures existing since his departure from Norwich, he had not been able to resume college studies other than to take one night course at a community college. At the time of trial, plaintiff's pursuit of a college education had been delayed more than six years as a result of his experiences at Norwich.

In calculating plaintiff's lost earnings, his expert economist analyzed the difference in earnings over a lifetime between a high school graduate and a college graduate. Using U.S. Census Bureau data, and discounting the figures for present value, he determined that if plaintiff were a college graduate he would earn between $600,000 and $932,593 more over the course of his working life than he would as a high school graduate. The jury awarded plaintiff $300,000.

The difficulty of precise computation of the losses plaintiff has and will continue to incur as a result of his premature departure from Norwich is not a ground to reverse a lost earnings award. See *Imported Car Ctr., Inc. v. Billings*, 163 Vt. 76, 82, 653 A.2d 765, 770 (1994) (upholding award of damages where plaintiff continued to incur expenses throughout trial and exact amount of damages could not be ascertained). Nor do we reverse such an award where a plaintiff has not yet acquired an earning capacity. See *Melford v. S.V. Rossi Constr. Co.*, 131 Vt. 219, 223-24, 303 A.2d 146, 148 (1973) (holding that a person is not deprived of right to recover damages for loss of earning capacity in future, by fact that at time of injury he is not engaged in any particular employment).

 There was ample evidence before the jury to support its award of lost earning capacity. Based upon the evidence presented at trial, the jury could have considered and weighed such issues as whether and when plaintiff would return to college, the impact of the six years that had elapsed since his departure from Norwich, as well as his likelihood of successful completion if he returned to college. Applying its assessment of these and other variables to the testimony of the expert, the jury could reasonably have found that plaintiff lost or would lose approximately one-third of a college-educated working life as a result of his withdrawal from Norwich and subsequent inability to resume a college education; the jury's award of $300,000 for past and future lost earning capacity — less than one-third of the

total amount the expert testified plaintiff would lose over his working lifetime — is reasonably supported by the evidence.

## III. Punitive Damages

The purpose of punitive damages is to "'punish conduct which is morally culpable . . . [and] to deter a wrongdoer . . . from repetitions of the same or similar actions.'" *Coty v. Ramsey Assocs.*, 149 Vt. 451, 467, 546 A.2d 196, 207 (1988) (quoting *Davis v. Williams*, 402 N.Y.S.2d 92, 94 (Civ. Ct. 1977)). Punitive damages are permitted "[w]here the defendant's wrongdoing has been intentional and deliberate, and has the character of outrage frequently associated with crime." W. Keeton, et al., Prosser and Keeton on the Law of Torts § 2, at 9 (5th ed. 1984). It is not enough to show that defendant's acts are wrongful or unlawful — there must be proof of defendant's "bad spirit and wrong intention." *Agency of Natural Resources v. Riendeau*, 157 Vt. 615, 624-25, 603 A.2d 360, 365 (1991). Consistent with the view that punitive damages are to be applied to deter and to punish "truly reprehensible conduct," *Tuttle v. Raymond*, 494 A.2d 1353, 1361 (Me. 1985), Vermont has long required a plaintiff to demonstrate that a defendant acted with malice in order to recover punitive damages. See *Sparrow v. Vermont Savings Bank*, 95 Vt. 29, 33, 112 A. 205, 207 (1921).

The Vermont test for the malice necessary to establish liability was first announced in 1921 in *Sparrow*, and most notably stated in *Shortle v. Central Vermont Public Service Corp.*, 137 Vt. 32, 33, 399 A.2d 517, 518 (1979): "It must be shown that there was actual malice. This may be shown by conduct manifesting personal ill will or carried out under circumstances evidencing insult or oppression, or even by conduct showing a reckless or wanton disregard of one's rights." This test has been cited frequently since. See, e.g., *Murray v. J & B Int'l Trucks, Inc.*, 146 Vt. 458, 465, 508 A.2d 1351, 1355 (1986); *Bruntaeger v. Zeller*, 147 Vt. 247, 252-53, 515 A.2d 123, 127 (1986); *Ryan v. Herald Ass'n, Inc.*, 152 Vt. 275, 281, 566 A.2d 1316, 1320 (1989); *Meadowbrook Condominium Ass'n*, 152 Vt. at 28, 565 A.2d at 245; *Crump v. P & C Food Markets, Inc.*, 154 Vt. 284, 298, 576 A.2d 441, 449 (1990); *Wheeler v. Central Vt. Med. Ctr., Inc.*, 155 Vt. 85, 96, 582 A.2d 165, 171 (1989); *Riendeau*, 157 Vt. at 624, 603 A.2d at 365.

We have found punitive damages inappropriate where the evidence shows only that the defendant engaged in wrongful conduct. See *Bruntaeger*, 147 Vt. at 254, 515 A.2d at 127 (punitive damages properly denied because "defendant's conduct, however wrongful,

was not malicious"); *Meadowbrook*, 152 Vt. at 28, 565 A.2d at 245 (after trial court assessed punitive damages because of defendant's "willful violation" of consumer protection statute, Supreme Court reversed because "defendant's conduct . . . however wrongful, did not evince the degree of malice required"). In *Riendeau*, the trial court assessed civil and punitive damages because the defendants in that case "knowingly and willfully discharged substances into waters of the state." 157 Vt. at 623-24, 603 A.2d at 361-62. This Court remanded for further proceedings on punitive damages because "we believe that there must be some showing of bad motive to make knowing and intentional conduct malicious." *Id.* at 625, 603 A.2d at 365.[2]

Here, plaintiff's theory of Norwich's liability for punitive damages was predicated not upon a showing of defendant's "bad motive" in engaging in intentional misconduct, but instead upon "Norwich's conscious choice to remain ignorant [of hazing] activities." In upholding the punitive damages award, the judge described the rationale for the punitive damages request: "The jury was asked to impose punitive damages in order to punish Norwich for its *inaction and inattention* to the issue of hazing on campus." (Emphasis added.)

■ A corporation may be held directly liable for punitive damages. As stated in *Shortle*, 137 Vt. at 33, 399 A.2d at 518:

> The fact that the defendant is a corporation does not prevent an award of punitive damages in an appropriate case, but the malicious or unlawful act relied upon must be that of the governing officers of the corporation or one lawfully exercising their authority, or, if the act relied upon is that of a servant or agent of the corporation, it must be clearly shown that the governing officers either directed the act, participated in it, or subsequently ratified it.

While we have made clear our view that the board of trustees and management hierarchy of a corporation cannot insulate itself from the malice or its equivalent exhibited by staff, see *Wheeler*, 155 Vt. at 96, 582 A.2d at 171, we are not prepared to hold that inaction or inattention of senior corporate officers constitutes malice sufficient to

---

[2] Unlike the dissent, we do not construe the remand in *Riendeau* as diminishing the malice necessary for punitive damages. See *Kolstad v. American Dental Ass'n*, 108 F.3d 1431, 1443 (D.C. Cir. 1997) (Williams, J., dissenting) (referring to *Riendeau* and *Bruntaeger* for the proposition that "Vermont courts have used 'reckless' language, but seem to require bad motive on top of the intentional tort.").

establish punitive damages liability. This is particularly true where, as here, the findings of fact made by the judge in upholding the jury's punitive damages award are insufficient to support an inference that the defendant's inaction was infused with "a bad motive," *Riendeau*, 157 Vt. at 625, 603 A.2d at 365, giving rise to "outrage frequently associated with crime." Prosser, *supra*, § 2, at 9.[3]

Viewing the evidence in the light most favorable to plaintiff, as we must, the facts demonstrate that senior leadership at Norwich knew of numerous, often serious, hazings by the cadre that had taken place on campus during the years preceding plaintiff's arrival there, and that Norwich officials left the cadre in "virtually unsupervised control" of plaintiff as a rook. A senior vice-president knew that rooks felt intimidated by the prospect of entering a complaint about hazing through the chain of command, and that no formal method of complaining about hazing outside of the chain of command existed while plaintiff was a rook. Furthermore, a security officer testified that he felt he was not encouraged to report hazing. From 1987 to 1991, Norwich did not implement any changes to its training of student leaders related to hazing, and no changes were introduced to the training patterns that were aimed at avoiding or reducing hazing. Significantly, however, the evidence indicates that Norwich considered hazing to be an inappropriate behavior and, when training the cadre, advised its members to stay within the rule and treat each other suitably. Norwich had an honor code, sworn to by all students, which prohibited hazing. When specific incidents of hazing were reported to the senior vice-president, investigations were conducted. If reports were found to be valid, disciplinary action was taken, ranging from punishment within the corps or loss of a cadet's rank, to suspension or dismissal from Norwich. Disciplines were announced to the students by publishing an order from the administrative officer of the commandant's office, posting it on all bulletin boards, and giving it to all members of the corps. It was also read in company formation.

On the basis of this record it may be fair to conclude, as indeed the court did, that the defendant was "indifferent to the health and safety

---

[3]The dissent asserts that our emphasis on malice abandons "clear, well-articulated standards" leaving future defendants "more vulnerable" to potentially arbitrary punitive damages awards. We are unable to discern how the reckless disregard test favored by the dissent preserves clarity or reduces vulnerability. Allowing punitive damage awards solely on the basis of a "'reckless disregard of the rights of others'" presents "'the danger of . . . a test which may be so flexible that it can become virtually unlimited in its application.'" *Owens-Illinois, Inc. v. Zenobia*, 601 A.2d 633, 651 (Md. 1992) (quoting *Smith v. Gray Concrete Pipe Co.*, 297 A.2d 721, 731 (Md. 1972)).

of the rooks in its custody and control." But indifference attributable to negligence is not malice. See Prosser, *supra*, § 2, at 10:

> There is general agreement that, because it lacks [the element of malice], mere negligence is not enough, even though it is so extreme in degree as to be characterized as "gross," a term of ill-defined content, which occasionally, in a few jurisdictions, has been stretched to include the element of conscious indifference to consequences, and so to justify punitive damages.[4]

" 'To sanction punitive damages solely upon the basis of conduct characterized as 'heedless disregard of the consequences' would be to allow virtually limitless imposition of punitive damages.' " *Tuttle*, 494 A.2d at 1361 (quoting *Miller Pipeline Corp. v. Broeker*, 460 N.E.2d 177, 185 (Ind. Ct. App. 1984)).[5]

■ We conclude, then, with the view that Norwich's action or inaction, "however wrongful, did not evince the degree of malice required" under our cases. *Meadowbrook*, 152 Vt. at 28, 565 A.2d at 245. Punitive damages awarded on these facts would only "dull[ ] the potentially keen edge of the doctrine as an effective deterrent of truly reprehensible conduct." *Tuttle*, 494 A.2d at 1361.[6]

### IV. Motion for New Trial

■ Finally, Norwich claims that the court erred by denying its motion for a new trial. A decision concerning a motion for new trial pursuant to V.R.C.P. 59(a) lies within the sound discretion of the trial court and will be reversed only where there has been an abuse of

---

[4] In closing argument, plaintiff's counsel brought home the true nature of Norwich's conduct: "Ladies and gentlemen of the jury, it's not just negligent. It's grossly negligent to do nothing in the face of knowledge that people are being injured, people for whom Norwich had responsibility. And that's the way Norwich responded, they did nothing different. Business as usual."

[5] We note that even the application of a "conscious indifference" or similar standard to the facts of this case would unlikely be sufficient to establish a claim for punitive damages. See *Furek v. University of Delaware*, 594 A.2d 506, 523 (Del. 1991) (despite notice three years prior to plaintiff's injuries that dangerous hazing activities (including incident where student was branded with hot coat hanger) continued unabated on campus, university's ineffectual response found not a conscious disregard of known risk sufficient to sustain claim for punitive damages).

[6] Because we reverse the award of punitive damages, we do not reach Norwich's claim that the court erred in excluding evidence offered by Norwich in mitigation of punitive damages, nor do we address defendant's claim that the punitive damage award was unconstitutional.

discretion. See *Hoague v. Cota*, 140 Vt. 588, 591, 442 A.2d 1282, 1283 (1982). "Such abuse will be found only when the trial court has entirely withheld its discretion or where the exercise of its discretion was for clearly untenable reasons or to an extent that is clearly untenable." *Lent*, 143 Vt. at 552, 470 A.2d at 1171. We afford "all possible presumptive support, similar to the support the trial court owes to a jury verdict." *Gregory v. Vermont Traveler, Inc.*, 140 Vt. 119, 121, 435 A.2d 955, 956 (1981)). In light of our consideration of the record in connection with Norwich's motion for judgment as a matter of law, we find no abuse of discretion.

*The judgment of punitive damages is reversed. The judgment is affirmed in all other respects.*

**Johnson, J.,** dissenting. The decision whether to award punitive damages against a defendant represents an area of unparalleled discretion on the part of the jury in a civil trial. As a result, punitive damages have been a controversial issue. For this reason, it is critical to have clear guidelines for juries to follow in deciding whether or not an award of punitive damages is appropriate. While the majority today reverses the award of punitive damages in this particular case, it leaves future defendants more vulnerable to potentially arbitrary punitive damages awards by loosely applying the ill-defined concept of "malice," a term we have criticized in the criminal context as arcane and confusing. See *State v. Johnson*, 158 Vt. 508, 518-19, 615 A.2d 132, 136 (1992). In so doing, the majority departs from our holding in *Shortle v. Central Vermont Public Service Corp.*, 137 Vt. 32, 33, 399 A.2d 517, 518 (1979) (malice may be shown by presence of either personal ill will or reckless disregard for rights of another), even while purporting to rely on it.

In this case, the jury was properly instructed in accordance with Vermont law on the punitive damages issue, and had before it sufficient evidence to support the award of punitive damages based on a theory that defendant exhibited reckless disregard for plaintiff's rights. I believe it is error to invade the province of the jury to overturn this award. I therefore respectfully dissent.

The jury had before it the following facts. Defendant Norwich University authorized certain upperclass cadets (the "cadre") to indoctrinate and orient incoming cadets ("rooks"). Norwich University trained the cadre to fulfill this role. Plaintiff, a rook, left the university after the cadre verbally and physically harassed him so as to threaten his physical and mental well-being and interfere with his

academic studies. Cadre members interrogated plaintiff during meals, preventing him from eating. The cadre's harassment of plaintiff resulted in an injury to his shoulder, which was exacerbated by forced, unauthorized exercise sessions. Cadre members also vandalized plaintiff's room.

Plaintiff reported the hazing problems to the university before leaving and, in fact, Norwich University had been aware of persistent hazing problems emanating from the cadre. Despite this fact, the university did not remove the cadre from power, did not alter the training received by the cadre, and left the cadre in "virtually unsupervised control" over the rooks. Despite the cadre's proven unfitness for the task of indoctrinating and orienting the incoming cadets, Norwich continued to authorize the cadre to perform this task. The senior vice-president of Norwich knew that rooks felt intimidated about reporting hazing incidents through the chain of command but did nothing to improve the situation. On the basis of this evidence, the jury awarded plaintiff compensatory and punitive damages on plaintiff's theory that defendant had consciously chosen to remain ignorant of the hazing activities conducted by the cadre.

The majority reverses the jury's award of punitive damages. The pivotal piece of reasoning in the majority opinion equates malice with "bad motive" and concludes that, because plaintiff's theory of liability was based on defendant's "conscious choice to remain ignorant" rather than on defendant's affirmative act, this precludes a finding of bad motive and thus precludes an award of punitive damages. This reasoning is flawed on several counts.

First, the majority's reasoning is inconsistent with doctrine established in Vermont case law. Clear guidelines for awarding punitive damages were developed by this Court in *Sparrow v. Vermont Savings Bank*, 95 Vt. 29, 112 A. 205 (1921), and *Shortle*. These cases established that punitive damages were appropriate where there was actual malice as evidenced by either one of two factual predicates: (1) where a defendant expressed personal ill will toward a plaintiff (i.e., "bad motive"), or (2) where a defendant exhibited reckless or wanton disregard of a plaintiff's rights. See *Sparrow*, 95 Vt. at 33, 112 A. at 207; *Shortle*, 137 Vt. at 33, 399 A.2d at 518. In articulating the standard in this manner, these cases broke down the vague "malice" concept into two distinct prongs.

The majority states that, "[o]n the basis of this record it may be fair to conclude . . . that the defendant was 'indifferent to the health and safety of the rooks in its custody and control.' But indifference

attributable to negligence is not malice." The majority fails to recognize that, while it may be true that indifference is not the same as "bad motive," indifference can constitute "reckless disregard," a recognized component of malice under Vermont law. The majority cites a Maine case, *Tuttle v. Raymond*, 494 A.2d 1353 (Me. 1985), and a treatise to support its conclusion that "indifference is not malice" in Vermont, a conclusion that flies in the face of the settled principles of *Sparrow* and its progeny.

The majority additionally cites *Agency of Natural Resources v. Riendeau*, 157 Vt. 615, 603 A.2d 360 (1991), for the proposition that "there must be *some showing of bad motive* to make knowing and intentional conduct malicious." *Id.* at 625, 603 A.2d at 365 (emphasis added). Based on this quoted language, the majority concludes that bad motive is a required showing in all cases where punitive damages are awarded. This reasoning is erroneous, however, because the quoted language is taken out of context.

In a subsequent passage in *Riendeau*, we note that the trial court could have alternatively awarded punitive damages on a theory that the defendants were so indifferent to the environmental consequences of their acts that their conduct could be characterized as malicious. See *id.* We concluded that we could not uphold the award on the basis of this alternative theory, however, because the trial court had not made findings to this effect. See *id.* Notably, we remanded *Riendeau* to the trial court for additional findings on the issue of malice instead of simply vacating the award, as the majority does in the instant case.

Rather than supporting the majority's analysis, therefore, our holding in *Riendeau* reiterates established doctrine: that there are two alternative bases for a finding of malice, bad motive or reckless disregard. There is not a single, overarching "bad motive" requirement, as the majority implies. Equating malice exclusively with bad motive in this manner distorts the doctrine established in our earlier cases, effectively abandoning the second prong of the *Shortle* test. The majority cannot eliminate the second prong without at least partially overruling *Shortle*, on which it purportedly relies.

In addition to contradicting Vermont case law, the majority's reasoning is inconsistent with the policy rationale underlying punitive damages awards. By equating malice with bad motive and personal ill will, the majority opinion articulates a new standard for malice that is ill-suited to address the conduct of institutional actors, which cannot be said to have personal will as such. The implications of the

majority's opinion extend well beyond this case by eliminating an entire class of defendants from the scope of this important form of civil sanction. But clearly the conduct of institutional actors may reach a level of culpability meriting the imposition of punitive damages. Institutions act through setting policies, and in some instances, those policies demonstrate such flagrant disregard for the rights of others that they can rightly be characterized as malicious. This is especially true where, as here, an institution owes a duty to the person whose rights are violated. The "reckless disregard" component of the malice test reaches this type of conduct; by abandoning this component, the majority arbitrarily eliminates a category of malicious conduct from consideration.

It is especially problematic to define malice in such a way so as to exclude institutional actors from the application of punitive civil sanctions, because in many cases, as here, an institution will be in the best position to correct a potentially recurring danger. In addition to punishing morally culpable conduct, the other primary purpose of awarding punitive damages is to deter the individual defendant and other similarly situated actors from engaging in harmful activities where they have a choice about whether or not to engage in the activity. See R. Posner, Economic Analysis of Law 209 (4th ed. 1992). Thus, punitive damages are most effective where (1) compensatory damages alone will not provide adequate deterrence and (2) the defendant is the person or entity in the best position to prevent future recurrence of the harmful activity. See *id.* The majority's exclusive focus on bad motive and personal ill will, therefore, does not serve the deterrence function of punitive damages because it excludes some of the most obvious targets of deterrence.

Finally, the majority's exclusive focus on bad motive and personal ill will does not place sufficient emphasis on the role of harm to the public as a policy justification for the imposition of punitive damages. Generally, the goal of criminal sanctions is to punish, while the goal of civil sanctions is to compensate. See K. Mann, *Punitive Civil Sanctions: The Middleground Between Criminal and Civil Law*, 101 Yale L.J. 1795, 1796 (1992). Punitive sanctions are sometimes appropriate in the civil context, however, when a defendant "not only harms the victim, [but] undermines rules and distinctions of significance beyond the specific case." G. Calabresi & A.D. Melamed, *Property Rules, Liability Rules, and Inalienability: One View of the Cathedral*, 85 Harv. L. Rev. 1089, 1126 (1972) (discussing why compensation of victim is inadequate remedy in criminal cases). In this sense, some

civil defendants are similar to criminal defendants in that their conduct represents a harm to the public as well as to an individual victim. It is the presence of a harm to the public that justifies punishment.

In this case, the jury may have fairly and reasonably concluded that Norwich University undermined important rules and norms of society by sanctioning hazing by cadets it had placed in a position of power over other cadets. There was sufficient evidence indicating that the university's policies might potentially have a negative impact on a much broader group of people than just the plaintiff alone, thereby justifying the imposition of punitive damages by the jury.

The only remaining questions, therefore, are whether the jury was properly charged and whether there was sufficient evidence on the record to support the jury's verdict. Our review of the jury's decision to award punitive damages is limited. When reviewing a jury verdict to determine if it was supported by sufficient evidence, the standard is whether, when the evidence is looked at in the light most favorable to the prevailing party, there is any evidence which fairly and reasonably tends to support the jury verdict. See *Turgeon v. Schneider*, 150 Vt. 268, 270, 553 A.2d 548, 550 (1988). The jury was properly charged in accordance with Vermont law,[1] and there appears to be no basis for challenging the jury's verdict as a matter of law.[2]

The jury had before it sufficient evidence to support an award of punitive damages based on a theory that defendant acted with reckless disregard for plaintiff's rights. The trial court found that "[o]fficers of Norwich were aware of incidences [sic] of hazing which perennially were perpetrated by the cadre, yet the officers left the cadre in virtually unsupervised control of Mr. Brueckner as a rook at Norwich." The majority errs by characterizing defendant's conduct as omission rather than affirmative act. It is true that the university's

---

[1] The trial court charged the jury as follows:

> The plaintiff must show that the defendant acted with malice, bad faith, or with reckless disregard of the plaintiff's rights. Malice may be shown by conduct manifesting personal ill will or carried out under circumstances evidencing insult or oppression or by conduct showing reckless or wanton disregard of one's rights. The purpose[s] of punitive damages are to punish conduct that is morally culpable and to deter potential wrongdoers from repeating the conduct in the future.

The trial court additionally instructed the jury on the correct standard for awarding punitive damages against a corporation.

[2] The majority's analysis of the applicable legal standard is dictum, therefore, as it points to no flaw in the jury instructions and no specific inadequacy in the evidence.

conduct can be characterized as "inaction and inattention" in the sense that, at the time of plaintiff's injuries, the university had not embarked on a new course of action but had simply allowed the status quo to continue. That status quo, however, was the result of the university's affirmative act of authorizing the cadre to discipline and orient incoming students. The jury may have fairly and reasonably concluded that malice — understood as reckless disregard of another's rights — was evidenced by the fact that the university, which knew of the hazing problem, could have remedied it by eliminating the "virtually unsupervised control" that the cadre enjoyed over the cadets, but declined to do so. Indifference in the face of a known threat to the health and safety of another, where there is also a duty to protect that person's health and safety, as there was here, could fairly and reasonably lead to a jury's conclusion that defendant recklessly disregarded plaintiff's rights.

The decision whether to award punitive damages is firmly rooted in the discretion of the jury. See *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 15, 19 (1991); K. Mann, *supra*, at 1799 ("The privately invoked [punitive civil] sanction derives from the common law right of the jury to award exemplary damages, and is thus doctrinally circumscribed by little other than the concept of discretion uninfluenced by corrupt motive."). The jury in this case was presented with the facts, and had the opportunity to evaluate the credibility of the witnesses and to assign weight to the evidence. The jury was therefore in the best position to evaluate the moral culpability[3] of Norwich University and the need to deter it and other similar institutions from continuing the policies that gave rise to plaintiff's injuries.

The majority's searching review for a sufficient level of malice — a review apparently guided by nothing more than a subjective sense of what is "enough" malice — represents an unjustified invasion into the province of the jury by an appellate court. The majority thus introduces arbitrariness into the process at two levels. It introduces

---

[3] Defendant argues that it did not possess the degree of moral culpability that would justify an award of punitive damages by referring to other cases in which educational institutions were found not to be liable for punitive damages for hazing that occurred on their campuses. These cases, however, are inapposite. Norwich University is unlike these institutions in that it is styled as a military academy in which students have very little personal freedom and little choice about with whom they will associate. Furthermore, a select group of students (the cadre) are trained and given explicit control over the incoming students (the rooks) by the university. Thus the university has a relationship to those students who form the cadre that is unlike the relationship between a nonmilitary university and its students, be they members of a fraternity or unaffiliated. This distinction is a sufficient basis for the jury's verdict.

arbitrariness at the level of the jury's decision by abandoning the two-pronged malice test for a single, ill-defined, subjective criterion, i.e., "enough" malice. Secondly, it introduces arbitrariness at the appellate level by encouraging this Court to impose its own sense of what is "enough" malice. Needless to say, the abandonment of clear, well-articulated standards for the award of punitive damages ultimately does a disservice to defendants.

There has been a great deal of concern expressed over the fact that jury awards of punitive damages are out of control. The only way to curb this trend is to formulate and adhere to clear principles that juries can follow in deciding whether or not to make a punitive damages award. This goal is not furthered when an appellate court imposes a vague "malice" standard that departs from established doctrine when it reviews a jury verdict. Rather, trial courts should provide guidance by directing juries to consider the purposes of punitive damages — to punish and to deter — and to follow the two-pronged test established in *Shortle*.

The trial court provided accurate guidance to the jury in the instant case, and the jury had sufficient evidence to find that Norwich University acted with reckless disregard of plaintiff's rights. Therefore, their decision to award punitive damages should be allowed to stand.