Lenoci v. Leonard, No. 604-8-08 Rdcv (Eaton, J., Apr. 15, 2010)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

# STATE OF VERMONT
# RUTLAND COUNTY

|  |  |  |
|---|---|---|
| | ) | |
| **PAMELA LENOCI, ADMINISTRATIX OF** | ) | **Rutland Superior Court** |
| **THE ESTATE OF ALEXANDRA BROWN,** | ) | **Docket No. 604-8-08 Rdcv** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **KAYLA LEONARD,** | ) | |
| | ) | |
| **Defendant** | ) | |

## DECISION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, FILED FEBRUARY 1, 2010

This case arises out of the suicide of fifteen year-old Alexandra Brown. Pamela Lenoci, Alex's mother and Administratix of Alex's Estate, alleges that eighteen year-old Kayla Leonard was negligent in bringing Alexandra to an apartment party, where Alex consumed alcohol and had sexual intercourse with a nineteen year-old man, and that this incident was a proximate cause of Alexandra's suicide two days later. In moving for summary judgment, Ms. Leonard argues that she owed no duty to Alex and that her actions were not the proximate cause of Alex's suicide. Plaintiff Pamela Lenoci is represented by Peter F. Langrock, Esq. and Benjamin L. Wilson, Esq. Defendant Kayla Leonard is represented by John E. Brady, Esq.

## Summary Judgment Standard

Summary judgment is appropriate where there is no genuine issue of material fact and the party is entitled to judgment as a matter of law. V.R.C.P. 56(c)(3). In response to an appropriate motion, judgment must be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, . . . show

that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law." V.R.C.P. 56(c)(3). In determining whether a genuine issue of material fact exists, the court accepts as true allegations made in opposition to the motion for summary judgment, provided they are supported by evidentiary material. *Robertson v. Mylan Labs*, *Inc.,* 2004 VT 15, ¶ 15, 176 Vt. 356. The nonmoving party then receives the benefit of all reasonable doubts and inferences arising from those facts. *Woolaver v. State*, 2003 VT 71, ¶ 2, 175 Vt. 397. Furthermore, where, as here, "the moving party does not bear the burden of persuasion at trial, it may satisfy its burden of production by showing the court that there is an absence of evidence in the record to support the nonmoving party's case. The burden then shifts to the nonmoving party to persuade the court that there is a triable issue of fact." *Ross v. Times Mirror, Inc.,* 164 Vt. 13, 18 (1995) (internal citations omitted).

## BACKGROUND

Alexandra Brown lived in Rutland, Vermont with her mother, Pamela Lenoci, her stepfather, Thomas Lenoci, and her younger half-brother, Quinton Lenoci. She attended Rutland High School. Alex's biological father lived in Florida.

In February 2006, Alex, then a 14 year-old freshman, met Jeffrey Stone, a 17 year-old senior at Rutland High. Alex and Jeffrey began dating in May 2006 and began having sexual intercourse in June, after Alex turned 15. During a doctor's appointment shortly after the sexual relationship began, Alex admitted to her mother that she and Jeffrey were having sexual intercourse. Thereafter, Mr. and Mrs. Lenoci talked to Alex and Jeffrey and forbade them from having sex, but allowed the relationship to continue by permitting supervised visits.

2

Alex and Jeffrey, however, continued to see each other unsupervised. Jeffrey would come to the Lenoci residence and wait in his car nearby while Alex snuck out of her bedroom window. This conduct occurred even after Jeffrey turned 18 years old in August 2006. At the time, Alex was still 15 years old. At Jeffrey's deposition, he declined to answer questions about whether he and Alex continued to have a sexual relationship after he turned 18 years old, for fear of exposure to statutory rape charges. At the deposition, Jeffrey asked the deposing attorney if he needed a lawyer and stated that he was uncomfortable answering any questions about whether he had sexual intercourse with Alex after the talk with Alex's mother and stepfather. Jeffrey did admit, however, that they continued to be boyfriend and girlfriend and that they continued to be "intimate" and would still "make out."

After graduating from Rutland High, Jeffrey enrolled at Wilkes University in Pennsylvania. Alex and Jeffrey continued a long-distance relationship while she was a 15 year-old sophomore in high school and he was an 18 year-old freshman in college. Alex and Jeffrey would sometimes have verbal fights over the phone while he was away at college. During some of these fights Alex would threaten to commit suicide. Jeffrey did not believe her and thought it was a cry for attention. Thus, he did not tell anyone that she was threatening to commit suicide. However, Ms. Lenoci and Alex had had talks about suicide in the past.

At least one week before Alex's suicide, she and Jeffrey had a fight over the phone during which she told him that she felt like committing suicide. She told him that she had even picked out a tree to hang herself. Although she could not find a rope to hang

herself with, she had found an electrical chord to use. Jeffrey did not tell anyone that Alex was threatening to commit suicide.

On President's Day weekend, February 17 and 18, 2007, Jeffrey came back to Rutland to visit Alex and watch her in a figure skating recital. He brought Alex flowers, watched the recital, and the two visited with each other at the Lenoci residence on Saturday night. They did not visit with each other on Sunday. Jeffrey then went back to Pennsylvania because he had classes on Monday.

Alex did not have school that following week and Ms. Lenoci had planned a vacation to Florida with Alex and Quinton. Ms. Lenoci had purchased plane tickets for all three of them. Just before they were to leave for Florida, Alex told her mother that she had a hockey playoff game on Wednesday for Rutland High for which she wanted to stay home. Neither Mrs. Lenoci nor Mr. Lenoci verified this information. Ms. Lenoci allowed Alex to stay in Vermont for the hockey game. Mr. Lenoci was not going on the trip and he would watch Alex. As it turned out, there was no hockey game and Alex had lied to her parents.

Alex had planned to sneak off to Pennsylvania for the week to visit Jeffrey at college. They had made these plans a few weeks before and the fake hockey game was part of the ruse. However, this plan did not come to fruition. In the weeks leading up to the planned visit there was verbal fighting between Alex and Jeffrey regarding their relationship. According to Jeffrey, they had broken up three or four times in the previous months.

On Monday, February 19, Alex told her stepfather that she wanted to spend the night at the house of her friend Kayla Leonard. Kayla was an 18 year-old senior at

Rutland High. Alex told her stepfather that she was staying at Kayla's house and Kayla told her parents that she was staying at Alex's house. Mr. Lenoci did not confirm this sleepover with Kayla's parents, nor is there any evidence that Mr. Lenoci spoke with Kayla at anytime. Before leaving for the night, Alex stole a bottle of Captain Morgan rum from her parents' liquor cabinet as well as other various bottles of liquor. According to Jeffrey, Alex had begun drinking more often since Christmas vacation.

Kayla picked Alex up at the Lenoci residence at around 7:00 pm and they went to the house of a friend named Brad Pierce. At Brad's house they watched television with a group of friends until 11:00 pm. Brad's parents were home during this time.

After leaving Brad's house, Kayla and Alex travelled, with Kayla driving, to meet another friend, Nick Lawrence. Nick was at the apartment of Zach McCormick, located off West Street in Rutland. Zach was 19 years old. Also present was a young man named Rob Hance and a young woman named Jamie, who did not stay the night. Alex brought the stolen liquor to the apartment. There was also other alcohol at the apartment as well as marijuana. Alex drank alcohol at the apartment party and became intoxicated, although it is unclear how much alcohol she consumed. There is no evidence that Alex smoked marijuana. Kayla did not drink nor did she smoke marijuana.

Throughout the night, Alex and Kayla danced around the apartment. At one point, Alex took off her top and pictures were taken of her using a cell phone camera. These pictures were sent to Jeffrey. Alex also took off her pants, but Kayla made her put them back on. Alex also kissed Rob, Nick, and Zach. At some point, Nick got sick and Alex attended to him in the bathroom. Alex and Kayla spent the night at the apartment because

they had both lied to their parents about spending the night at each other's houses. Thus, they could not return to either residence.

When it was time to go to sleep, Kayla, Alex, and Zach went into Zach's bedroom. All three slept in Zach's bed. Alex and Zach engaged in sexual intercourse. Alex was 15 years old and Zach was 19 years old. Kayla knew that that the two were engaging in sexual activity, but did not attempt to stop it. Kayla and Alex went home the following morning, Tuesday, February 20.

On Tuesday, Alex told her stepfather that she wanted to spend the night at the home of her friend Marissa Serafino. Marissa was also a member of the Rutland High hockey team. Alex said that she would spend the night with Marissa and Marrissa's mother would bring them to the playoff hockey game on Wednesday. But, Alex never intended to spend the night with Marissa Serafino. This was just a cover to hang out at Zach's apartment again on Tuesday night. Marissa was not involved in this ploy and only learned of it after Alex's suicide.

In order to pull off her plan, Alex called a friend and had her pretend to be Mrs. Serafino. She then handed the phone to her stepfather and told him that Mrs. Serafino wanted to speak with him. Mr. Lenoci was concerned that this person may be one of Alex's friends pretending to be Mrs. Serafino because of how young her voice sounded. Nevertheless, he gave Alex permission to spend the night at the Serafino household. Alex told her stepfather that her hockey gear was clean and that she would not be back from the hockey game until Wednesday evening.

Mr. Lenoci would go to bed early because of his job. On that night, he began to get ready for bed at about 7:00 pm. At 7:45 pm, Mr. Lenoci told Alex goodnight.

Afterwards he began to get suspicious. At 8:30 pm, he heard Alex talking on her cell phone and then heard the front door shut. He looked out the front door, but did not see any car headlights. Alex was walking down the driveway towards a car which had not come up the driveway. Mr. Lenoci found this suspicious. He attempted to call Alex's cell phone but, in a panic, could not find her number. He called his wife, who was in Florida, and told her of the situation. Ms. Lenoci immediately called Alex and left a message questioning whether she was really at the Serafino's. Unbeknownst to her mother and stepfather, Alex was out with Nick and Brad.

Ms. Lenoci called the Serafinos and learned that there was no plan for Alex to spend the night. She also called the state police and reported Alex missing. Mr. Lenoci was very concerned about Alex's whereabouts as well and considered driving around to look for her. At about 9:45 pm, he finally fell asleep.

Ms. Lenoci called Alex numerous times and left messages on her daughter's cell phone. Alex never answered. In the messages, Ms. Lenoci questioned where Alex was, and also advised Alex that she had been caught, that there were going to be "massive massive consequences," and that the state police had been called and Alex had been reported as missing.

Throughout the night, Alex sent numerous text messages to her friends in which she addressed being caught by her parents. In one message, Alex stated, "laying on the couch planning on how to kill myself." In a text message to Brad, Alex stated, "so basically there goes any chance I ever had with you, Jeff hates me, my parents are going to kill me, I won't have my cell, my ipod, or my laptop for the rest of my life, they have

all my liquor, I really wanted to hang out with you, I'm hoping I didn't ruin your night, AND there's nothing to eat! Life as I know it is over."

Alex sent numerous text messages to Jeffrey as well, stating, "I got caught tonight. I'm grounded forever. Goodbye," and "It was nice knowing you. My life is over. I can't see you anymore." In one text message, Alex explained to Jeffrey how she had been caught by her parents and that there was no hockey game. She stated, "I'm going to kill myself." At some point, Alex and Jeffrey spoke by phone and Alex admitted that she had gotten drunk the night before at Zach's house. She did not tell Jeffrey about the sexual intercourse between herself and Zach at that time. Later in the night, Alex left Jeffrey a voicemail on his cell phone in which she admitted to having sex with Zach the night before. She told Jeffrey good bye.

Alex did not send Kayla any text messages threatening suicide. In her final text message to her friends and her mother at 11:42 pm, Alex stated, "I'm so so sorry."

At some point in the night, while Mr. Lenoci was sleeping, Alex came back to the house. In her bedroom, she wrote out a suicide note. In the note, Alex stated "needless to say I've ended my life. I did it mostly because Jeff hates me, and I hate me. last [sic] night I got drunk and had sex with a complete stranger. I couldn't believe it. Why did I have to ruin my life?" She further wrote to Jeff that she loved him but "you just put too much pressure on me to be all yours." Kayla is not mentioned in the suicide note.

Alex was not under the influence of any drugs or alcohol on Tuesday night and early Wednesday morning. She left the house and went to the garage where she got an electrical cord. She walked towards a smaller tree, then changed direction and walked to

a larger tree. This is known because of the set of footprints she left behind in the snow. Alex then committed suicide by hanging herself with the electrical cord.

There is no evidence that Kayla had any knowledge that Alex was suicidal.

Pamela Lenoci, as Alexandra Brown's mother and Administratix of Alexandra Brown's Estate, has brought survival claims for negligent infliction of emotional distress and invasion of privacy, and a wrongful death claim against Kayla Leonard. The Court previously dismissed the claim for invasion of privacy.

Plaintiff alleges that Kayla had a duty to protect Alex from harm at the apartment party and that she breached that duty by not stopping the sexual conduct between Zach and Alex. Plaintiff alleges that this resulted in emotional distress to Alex. Plaintiff further alleges that Kayla's actions in bringing Alex to the party and failing to protect her were the cause of Alex's suicide.

## DISCUSSION

*Negligent Infliction of Emotional Distress*

To establish a claim for negligent infliction of emotional distress, the plaintiff must make a threshold showing that she faced physical peril. *Brueckner v. Norwich University*, 169 Vt. 118, 125 (1999). The prerequisites for establishing a claim differ according to whether the plaintiff suffered a physical impact from an external force. *Id*. If there has been a physical impact, the plaintiff may recover for emotional distress stemming from the incident during which the impact occurred. *Id*.

Here, Plaintiff alleges that Alex suffered emotional distress because of the physical impact of the sexual intercourse with the 19 year-old man. Plaintiff seeks to hold Kayla liable, alleging that Kayla had a duty to protect Alex and she breached that duty by

bringing her to the apartment party and by not stopping the sexual intercourse from occurring.

To support a negligence claim, a plaintiff must show that the defendant owed her a legal duty, that she breached that duty, that the breach was the proximate cause of her injury, and that she suffered actual loss or damage. *Endres v. Endres*, 2008 VT 124, ¶ 11, 185 Vt. 63 (citing *O'Connell v. Killington, Ltd.*, 164 Vt. 73, 76 (1995)). "Duty, the first element, is central to a negligence claim, and its existence is primarily a question of law." *Endres*, 2008 VT 124, ¶ 11 (citing *Denis Bail Bonds, Inc. v. State*, 159 Vt. 481, 487 (1993)). "Duty is an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection." *Endres*, 2008 VT 124, ¶ 11 (quoting W. Keeton, et al., Prosser and Keeton on the Law of Torts § 53, at 358 (5th ed. 1984)) (internal quotation omitted).

The fact that a person realizes or should realize that action on her part is necessary for another's aid or protection does not of itself impose upon her a duty to take such action. Restatement (Second) of Torts, § 314. Special relations may exist between the person and the other which impose a duty to take affirmative precautions for the aid or protection of the other. *Id*. at cmt. a.

Courts, in general, recognize several formal relationships between a defendant and a plaintiff as grounds for imposing a duty of reasonable care. These include: (1) landowner and invitee (including common carriers and innkeepers); (2) custodian and ward; (3) schools and students; (4) spouses and their spouses, and parents and children; (5) employers and their employees. D. Dobbs, The Law of Torts § 323, at 876 (2001). The Restatement also includes a catch-all category: "[o]ne who is required by law to take

10

or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty to the other." Restatement (Second) of Torts, § 314A.

Plaintiff argues that when 18 year-old Kayla picked up 15 year-old Alex from the Lenoci residence that Monday night, Kayla voluntarily took Alex into her care and custody and owed Alex a duty to protect her as a parent would protect a child. Plaintiff has failed to cite any case law to support this argument. Likewise, the Court has not found any cases which impose a duty similar to that for which the plaintiff argues—a duty for an 18 year-old high school student to protect a high school friend who has not reached the age of majority.

Some courts have recognized that when a parent relinquishes the supervision and care of a child to an adult who agrees to supervise and care for that child, the supervising adult must discharge that duty with reasonable care. See *Kellermann v. McDonough*, 684 S.E.2d 786, 790-91 (Va. 2009), and cases cited therein. Here there is no evidence that Kayla ever agreed to supervise and care for Alex. To the contrary, it is undisputed that Kayla never spoke to Mr. and Mrs. Lenoci before picking up Alex. It is further undisputed that Alex lied to her parents about where she was going and stole alcohol from her parents' bar, which she later consumed. This was a case of two high school friends sneaking out together, unbeknown to either of their parents; not a situation where an adult agrees to care for another's child. Kayla did not become Alex's keeper simply because Kayla was 18 years old and Alex was not.

Kayla owed no duty to Alex to protect her. Thus, there is no genuine issue of material fact and the defendant is entitled to judgment as a matter of law on the claim of negligent infliction of emotional distress.

*Wrongful Death*

Plaintiff argues that Kayla's negligence in not supervising Alex led to Alex's sexual intercourse with the 19 year-old man, which in turn caused Alex's suicide two days later. Plaintiff attempts to transfer the alleged duty from the negligent infliction of emotional distress claim to a negligence claim for suicide. The Court has already found that Kayla did not owe Alex a duty to prevent the 19 year-old man from having sex with Alex at the apartment party. Nonetheless, the Court will analyze the wrongful death claim because it finds that a separate duty exists as to suicide.

The Vermont Supreme Court has yet to address the issue of negligence actions seeking damages for suicide. The New Hampshire Supreme Court has stated that "[a]s a general rule, negligence actions seeking damages for the suicide of another will not lie because the act of suicide is considered to be a deliberate, intentional and intervening act, which precludes a finding that a given defendant is, in fact, responsible for the harm." *Mikell v. School Administrative Unit # 33*, 972 A.2d 1050, 1054 (N.H. 2009). The Court of Appeals of Washington has held that there is no general duty in the law to protect others from self-inflicted harm and that "suicide is a voluntary willful choice determined by a moderately intelligent mental power, which knows the purpose and the physical effect of the suicidal act." *Webstad v. Sortini*, 924 P.2d 940, 945 (Wash. Ct. App. 1996).

A number of jurisdictions, however, have recognized two exceptions to the general rule: (1) liability exists because the defendant actually caused the suicide; and (2) liability exists because the defendant had a duty to prevent it. *Mikell*, 972 A.2d at 1054.

The first exception involves an intentionally tortious act by the defendant that is found to have caused a mental condition in the decedent that proximately resulted in an uncontrollable impulse to commit suicide, or prevent the decedent from realizing the nature of her act. *Mikell*, 972 A.2d at 1054. Here, the plaintiff has not provided any evidence, nor does she even allege, that Kayla committed an intentionally tortious act. Furthermore, there is no evidence of an uncontrollable impulse on Alex's part to commit suicide. To the contrary, the undisputed evidence is that Alex threatened to commit suicide numerous times in the weeks before her death. On one occasion, Alex even went into detail to her boyfriend Jeffrey about picking out the tree and using an electrical cord to hang herself. Alex also had talks about suicide with her mother, the plaintiff. Finally, on the night of her suicide, Alex sent text messages to her friends about being caught by her parents, told her friends goodbye, and then, while sober, picked out a tree and hanged herself with the same electrical cord she had told Jeffrey about weeks earlier. This is not evidence of an "uncontrollable impulse," but rather "a voluntary willful choice determined by a moderately intelligent mental power, which knows the purpose and the physical effect of the suicidal act." See *Webstad*, 924 P.2d at 945.

The second exception recognizes a cause of action when "the defendant has a specific duty of care to prevent suicide, arising from the defendant's special relationship with the suicidal individual." *Mikell*, 972 A.2d at 1054. "The typical defendant in such cases is someone who has a duty of custodial care, is in a position to know about suicide

13

potential, and fails to take measure to prevent from occurring." *Id*. Specifically, this duty has been imposed on institutions such as jails, hospitals and reform schools, which have actual physical custody over a person. *Id*. The duty has also been imposed on persons or institutions with special training to prevent suicide, such as mental institutions and psychiatrists. *Id*.

Here, Kayla came nowhere close to having the type of special relationship with Alex that would have given rise to a duty. There is no evidence that Kayla knew that Alex was suicidal. Kayla did not fail to take any measures to prevent the suicide from occurring. Kayla never had "actual physical custody" over Alex, nor did she have any special training in suicide prevention, such as a psychiatrist would have. See *Mikell*, 972 A.2d at 1054. Simply put, Kayla was an 18 year-old high school senior and a friend of Alex—not a mental health professional.

Kayla cannot be held liable for the suicide of her friend Alex. While Alex's suicide was certainly a tragedy, Kayla had no duty to prevent it and there is no evidence that Kayla did anything to cause it. Thus, there is no genuine issue of material fact and the defendant is entitled to judgment as a matter of law on the claim of wrongful death.

**ORDER**

Defendant Kayla Leonard's Motion for Summary Judgment, filed February 1, 2010, is GRANTED.

Dated at Rutland, Vermont this _____ day of _____, 2010.

_____
Hon. Harold Eaton, Jr.
Superior Court Judge

14