*Joan Reilly v. Southwest Vermont Supervisory Union et al.*, No. 152-4-14 Bncv (Valente, J., April 1, 2016).
[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

## STATE OF VERMONT

| | |
|---|---|
| SUPERIOR COURT<br>Bennington Unit | CIVIL DIVISION<br>Docket No. 152-4-14 Bncv |
| Joan Reilly,<br>　　　Plaintiff<br><br>　　　v.<br><br>Southwest Vermont Supervisory,<br>Bennington School District,<br>Kathy Buck,<br>Clayton Buck,<br>Laurie Connell,<br>　　　Defendants | DECISION ON MOTION |

## Opinion

This is a torts case involving a child on the autism spectrum who was allegedly mistreated by school employees. This alleged mistreatment included comments certain defendants made to and/or regarding the child and their use of restraints and seclusions in accordance with the child's behavior plan. Defendants have moved for summary judgment as to all counts on a number of grounds, including immunity and failure to make out prima facie cases. For the reasons stated below, Defendants' motion for summary judgment is GRANTED as to all four of Plaintiff's counts.

### Background

The following facts are undisputed for purposes of this ruling. N.R. is a minor child. His mother, Joan Reilly has brought this case on his behalf. N.R. attended second grade at Molly Stark Elementary School within Bennington School District (BSD) and Southwest Vermont Supervisory Union (SVSU) for the 2011-2012 school year. Andrick Aff. ¶¶ 3-4. In the second half of that school year, N.R.'s "problem behaviors" began increasing. J. Reilly Dep. 179:13-15, 261:6-15. These behaviors included yelling, teasing, threatening, invading classmates' personal spaces, and refusing to follow the rules. Andrick Aff. ¶ 4. Beginning in the summer of 2012, N.R. worked with employees of SD Associates. Andrick Aff. ¶ 7. He transitioned to Bennington Elementary School (BennEl) to attend third grade for the 2012-2013 school year.

On September 4, 2012, N.R. was assigned to a classroom in BennEl with other students for the first day of school. J. Reilly Dep. 237:22-238:1. Ms. Reilly stated that she would not allow employees of SD Associates to work with N.R. Andrick Aff. ¶ 8. "Throughout the week, [N.R.'s] behavior increased in severity and intensity in aggressive behavior." *Id.* On September

10, 2012, Ms. Reilly requested to observe N.R. in his classroom. *Id.* ¶ 9. That morning, N.R. knocked over chairs and a desk. *Id.* He kicked, hit, spat, screamed and pulled on the SD Associates employee's hair while Ms. Reilly stood watching. *Id.* ¶¶ 9-10. Eventually, Ms. Reilly took N.R. home. *Id.* ¶ 11.

On October 1, 2012, N.R. began attending an individualized program located in a church. *Id.* ¶ 13. The program would last approximately one hour each day and placed low academic demand on N.R. J. Reilly Dep. 182:22-25. N.R. was generally well-behaved during this time. *Id.* 184:2-5.

On October 25, 2012, an individual education plan (IEP) meeting was held between Ms. Reilly and relevant special education personnel to discuss conditions in which N.R. would return to BennEl. Andrick Aff. ¶ 14. Ms. Reilly attended the meeting, but she disputes receiving proper notice that it was going to be an IEP meeting. See J. Reilly Dep. 185:18-20. At the meeting, it was generally agreed that N.R. would return to BennEl for two hours a day with the possibility that he could stay for more hours sometime in the future. *Id.* 186:3-7; Andrick Aff. ¶ 14.

Also on that date, Christine Morse, a consultant from the New England Center for Children with Autism (NECC), helped the school select a room in BennEl for N.R. upon his return. Morse Aff. ¶ 8. Ms. Morse had been contacted by special education administrator Kathy Buck

Sometime in November or December, Kathy Buck hired her son Clayton Buck to work with N.R. as a paraeducator. Clayton Buck Dep. 4:15-16, 6:7-10.[1]

On November 5, 2012, Ms. Reilly decided that N.R. was going to remain at BennEl for the entire school day. J. Reilly Dep. 190:25-191:5, 194:5-9. On November 13, 2012, a meeting was held in which a behavior plan was implemented as part of his IEP. *Id.* 202:9-13. Under the "Accommodations" section the plan stated, "For safety and socia[l] reasons, N.R.'s time in the general education setting should be determined by his behavior." J. Reilly Dep., Def.'s Ex. F, at 1. The plan then explained what actions employees should take based on N.R.'s behavior. For instance, if he had "an aggression" there was a specific 8-step de-escalation procedure. *Id.* at 2-3.[2] "Aggressive behavior" was also defined in the plan. *Id.* at 1.

On November 15, 2012, Christine Morse spent five hours with N.R. and the school staff, instructing the staff on how to implement the behavior plan. Morse Aff. ¶ 9. During this visit, Ms. Morse and a school district employee decided to try a monitored seclusion technique. *Id.* ¶ 15. Ms. Morse's reason for resorting to this technique was that it appeared to her that N.R.

---

[1] In his deposition, Mr. Buck agreed that he was hired on December 13, 2012. However, Ms. Morse's affidavit states that on November 15, 2012, she spent five hours with N.R. and various staff members, including Mr. Buck. The court does not believe this discrepancy to be material.

[2] The procedure does not specifically mention the use of either seclusions or restraints. However, it is Ms. Reilly's understanding that both Clayton Buck and Laurie Connell utilized seclusions when the circumstances called for it as part of the behavior plan and that they did not come up with the technique on their own. See J. Reilly Dep. Dep. 23:1-12.

preferred the consequences relating to his unsafe behavior over positive reinforcement options. *Id.* ¶¶ 12-15.

Ms. Morse continued to have regular in-person visits in which she "observed staff's implementation of the behavior plan, provided feedback to staff, modeled implementation of the behavior plan with [N.R.], reviewed behavior data, problem-solved with staff and answered any questions that they had." Morse Aff. ¶ 22; see also Connell Dep. 14:11-17.

After the employees started secluding N.R., he began intentionally urinating on the floor. *Id.* ¶ 17. By December 2012, Ms. Reilly had come to a similar conclusion as Ms. Morse – that N.R. was engaging in problem behavior in order to gain control of adults and to avoid doing tasks he did not like. J. Reilly Dep. 254:18-22, 255:24-256:4.

After N.R. returned to BennEl from the individualized programming at the church, Ms. Reilly began noticing that the first thing N.R. would say when he came home from school was, "They're putting me in that room. They're being mean to me." J. Reilly Dep. 11:23-13:3. She interpreted the way he made these statements as indicating increased levels of anxiety. *Id.* 12:12. However, N.R. never said what "mean" thing was being done to him. *Id.* 14:25-15:3. Ms. Reilly assumed that the "mean" conduct was the use of seclusion and that the seclusions were the "trigger" for his anxiety. *Id.* 15:8.

On January 28, 2013, Laurie Connell began working with N.R. Connell Dep. 8:18-9:1. She was hired by SVSU in 2006 and was employed as an Intensive Needs Specialist. *Id.* 5:1-5; 21:9-10. N.R. exhibited some behavior issues Ms. Connell had never seen before. *Id.* 10:1-2. She and Mr. Buck would utilize seclusions when N.R. urinated on the floor or was being physically aggressive, but never when he was being verbally aggressive. *Id.* 16:16-20. Physical aggression, including N.R. raising a fist at them, also sometimes resulted in the use of restraints. *Id.* 106:19-107:9. The restraint technique used was either a standing or sitting basket hold. See e.g., *id.* 104:10-20 (describing how a standing basket hold would be performed on N.R.). Ms. Connell had received yearly training on how to de-escalate situations, including how to properly utilize restraints. *Id.* 103:12-19. There is no evidence indicating that the restraints or seclusions violated Vermont Agency of Education Rule 4500, which governs the use of such techniques.[3]

During the time N.R. attended BennEl, Ms. Reilly observed him returning home with bruises. J. Reilly Dep. 9:20-11:4. She took N.R. to a doctor one or two times and told the BennEl principal that she wanted the bruising to stop. *Id.* 29:8-30:11. She also noticed that he would sometimes

---

[3] Plaintiff disagrees with this assessment, citing to pages 205 and 206 of Dr. Joseph Hasazi's deposition. However, Dr. Hasazi's statements in these pages do not support Plaintiff's claim. In response to an objected-to question asking whether the use of between three and fifteen restraints a day is excessive, Dr. Hasazi said, "yes." Hasazi Dep. 205:21-25. There is no indication that the court can find in Dr. Hasazi's deposition or elsewhere suggesting that N.R. was actually subjected to that many restraints per day. Moreover, even if that were a reasonable inference, nothing in the cited-to pages mentions Rule 4500 or what would constitute a violation thereof. Dr. Hasazi expressly stated he had no opinion as to whether Rule 4500 was violated and that the rule was irrelevant to his expert opinion. *Id.* 91:1-21.

come home with scratches, but he never told his mother how he received the scratches and she never asked him how he was injured. *Id.* 142:8-14.

On February 13, 2013, Ms. Reilly surreptitiously placed a recording device inside a stuffed animal and attached the toy to N.R.'s backpack. *Id.* 91:14-16, 104:5-9. Throughout the day, the device recorded N.R. and various employees' voices. The parties agree that at least five comments were made directly to N.R., including a statement that they were going to call the police, a statement that he would have to stay in the room based on his behavior, a statement that he was going to have to clean up "all that other stuff," a statement telling him to go back to a corner of the room, a statement "you're not getting out of here," and a question asking him if he actually felt a certain way or if he was being told that he was feeling that way. Many, but not necessarily all, of these comments were made by Mr. Buck or Ms. Connell. Other statements, including a reference to N.R. as a "[dumba--] with autism," were allegedly made by the employees in a hallway outside N.R.'s room.[4] There is no direct evidence that N.R. actually heard any of those comments.

In the fall of 2013, N.R. attended a new elementary school, participating in a NECC program that had been created that summer. J. Reilly Dep. 44:15-19. According to Ms. Reilly: N.R. has not been held back academically due to the events at BennEl; his current aggressive behaviors are not attributable to those events; he is not restricted in participating in activities as a result of those events; and she did not suffer any monetary expenses as a result of these events. *Id.* 72:3-8, 72:17-20, 73:25-74:4, 80:15-18. She did not believe his behavior at BennEl, at least in December 2012, was due to anxiety. *Id.* 255:24-256:4. Her expert has compiled the number of instances involving problem behaviors between December and February 2013 and compared them to similar behavior over a one-month time period for the 2013-2014 school year based on school records. For instance, according to school records N.R. engaged in property destruction approximately 133 times between December 3, 2013 and February 1, 2013. Dr. Hasazi calculated that N.R. engaged in property destructing on average 1.5 times a day between October 28, 2013, and November 22, 2013. Hazasi Report at 4.

Regarding Mr. Buck and Ms. Connell's use of restraints, Ms. Reilly does not believe that they intended to harm N.R. J. Reilly Dep. 18:22-19:2. She believes N.R. was bruised as a result of the restraints. *Id.* 11:7. She also stated that the only emotional or mental harm resulting from the use of the restraints was that the problem behaviors reported at BennEl got worse. *Id.* 11:8-22. She believes that it was wrong for Kathy Buck to hire her son because Ms. Buck was aware of the ongoing problems with N.R. and Mr. Buck had inadequate autism-specific training or experience. *Id.* 48:13-24, 49:25-51:20.

---

[4] For this particular comment, Plaintiff claims Defendants admitted that this was said. She cites to Defendants' response to Plaintiff's Request for Admission #8. However, in that response, Defendants replied, "Denied." Apparently, Defendants admit that Mr. Buck did refer to N.R. as a "[dumba--]." See Defs.'s Reply Mem. in Support of Defs.'s Mot. for Summ. J. at 22. Another statement Ms. Connell admits to saying is telling Mr. Buck that she knew a child could go multiple days without eating or drinking before it would affect his body in response to N.R. pouring milk on the floor. Connell Dep. 72:14-76:1.

Ultimately, it is Ms. Reilly's opinion that the behavior plan "wasn't a good plan." *Id.* 23:19. She believes it was wrong for BennEl to stick with the plan despite N.R.'s behavior not improving. *Id.* 34:21-25.

*Summary Judgment Standard*

A party is entitled to summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Vermont Rule of Civil Procedure 56(a). A fact is material only if it might affect the outcome of the case. *O'Brien v. Synnott*, 2013 VT 33, ¶ 9, 193 Vt. 546. Where the nonmoving party bears the burden of persuasion at trial, the moving party satisfies its burden of production at summary judgment by showing the court that there is an absence of evidence in the record to support the nonmoving party's case. *Clayton v. Unsworth*, 2010 VT 84, ¶ 16, 188 Vt. 432.

"The burden then shifts to the nonmoving party to persuade the court that there is a triable issue of fact." *Id.* The nonmoving party will receive the benefit of all reasonable doubts and inferences, but only if the allegations made in their opposition to the summary judgment motion are supported by affidavits or other evidentiary material. *Robertson v. Mylan Labs., Inc.*, 2004 VT 15, ¶ 15, 176 Vt. 356. On the other hand, if the nonmoving party fails to support an assertion with a citation to the record, the court may consider the fact undisputed for purposes of the motion. *Hemond v. Frontier Commc'ns of Am., Inc.*, 2015 VT 66 (citing V.R.C.P. 56(c), (e)(2)).

*Analysis*

Plaintiff has brought four counts against three individual defendants, the school district, and the supervisory union. These counts are:

I.      Negligent infliction of emotional distress (against Clayton Buck and Laurie Connell);

II.     Negligent hiring and supervision (against SVSU, BSD, and Kathy Buck);

III.    Intentional Infliction of Emotional Distress (against Clayton Buck and Laurie Connell); and

IV.    "Respondeat Superior" incorporating the three previous counts (against SVSU, BSD, and Kathy Buck).

All defendants have moved for summary judgment for the following reasons: there is no admissible evidence of physical or mental injury to N.R.; schools and their employees may not be held liable for "educational malpractice;" and Plaintiff lacks sufficient evidence to support prima facie cases for each of her claims.

The individual defendants also claim that they are entitled to summary judgment because they are immune from suit under 24 V.S.A. § 901a and the doctrine of qualified immunity. As an

alternative, Mr. Buck and Ms. Connell argue that they should be entitled to summary judgment for conduct that occurred outside the time periods that they each worked with N.R.

For the reasons stated below, the court grants summary judgment on the basis of § 901a and the lack of sufficient evidence to support prima facie cases as to each of the counts.

## I. Section 901a immunity for individual defendants

Defendants Kathy Buck, Clayton Buck, and Laurie Connell have moved for summary judgment as to Count I (negligent infliction of emotional distress), Count II (negligent hiring and supervision), Count III (intentional infliction of emotional distress), and Count IV (incorporating counts I-III based on respondeat superior), asserting that 24 V.S.A. § 901a(b) immunizes them from suit. Plaintiff responds that supervisory union employees are not municipal employees under § 901a because the Legislature requires supervisory unions to indemnify their employees under 16 V.S.A. § 1756. Because § 901a only protects municipal employees, Plaintiff argues that the statute does not protect Ms. Buck, Mr. Buck, or Ms. Connell. For the following reasons, the court concludes that supervisory union employees are entitled to immunity under § 901a.

24 V.S.A. § 901a(b) states:

When the act or omission of a municipal employee acting within the scope of employment is alleged to have caused … injury to persons, … the exclusive right of action shall lie against the municipality that employed the employee at the time of the act or omission; and no such action may be maintained against the municipal employee or the estate of the municipal employee.

A "municipal employee" is defined in § 901a(a) and includes any person employed for a wage or salary by a municipality. Section 901a(a) does not say whether a school district or supervisory union are "municipalities." However, "[u]nless otherwise specifically provided in statute with respect to a class of school district or in a municipal charter, … the laws pertaining to municipal corporations … shall apply to all school districts." 16 V.S.A. § 551. Section 901a does not specifically state that a school district or supervisory union should be treated differently from other municipalities. Therefore, the court concludes that school districts and supervisory unions are municipalities under § 901a. See also *Farmer v. Poultney Sch. Dist.*, 113 Vt. 147, 149 (1943). Thus, under both statute and caselaw, Kathy Buck, Clayton Buck, and Laurie Connell may seek protection under § 901a(b) so long as they were acting within the scope of their employment.

### A. Applicability of § 901a to Mr. Buck and Ms. Connell in Count I

Plaintiff in Count I of her Complaint alleges that Clayton Buck and Laurie Connell are liable for injuries arising from the negligent infliction of emotional distress (NIED). There are two potential factual bases for this Count: the employees' alleged comments made on February 13, 2013, and the use of restraints and seclusions as part of N.R.'s behavior plan. Paragraphs 14 and 15 of the Complaint and Plaintiff's response to Defendants' motion for summary judgment indicate that both, not one or the other, are the factual bases for Count I.

6

While § 901a(b) immunizes municipal employees acting within the scope of their employment, § 901a(e) permits suits against individual employees who acted willfully, intentionally, or outside the scope of their authority. Because the question of whether a person was acting within the scope of employment is a fact-intensive inquiry, it is generally a question for the finder of fact. *Brueckner v. Norwich Univ.*, 169 Vt. 118, 123 (1999). Here, however, there is no genuine dispute as to whether Mr. Buck and Ms. Connell were acting within the scope of their employment by utilizing seclusions and restraints in accordance with the behavior plan. They were acting within the scope of their employment. Plaintiff's contention is not that they acted outside the scope of the behavior plan, but that the behavior plan itself "wasn't a good plan" and that it should have been changed once they realized N.R.'s behavior was not improving. J. Reilly Dep. 23:19, 34:21-25. Thus, because there is no genuine dispute that Mr. Buck and Ms. Connell were acting within the scope of their employment, summary judgment is proper regarding Count I to the extent that it is premised on the use of restraints and seclusions.

However, while some of the alleged comments may have been within the scope of Mr. Buck and Ms. Connell's authority (e.g. telling N.R. he would be secluded based on his behavior), some were not (e.g. referring to N.R. as a "[dumba--]"). As to comments that were within the scope of employment, the court does grant summary judgment on the basis of § 901a. As to comments that were potentially outside the scope of employment, these are addressed below.[5]

### B. Applicability of § 901a to Ms. Buck in Count II

Plaintiff in Count II of her Complaint alleges that Kathy Buck, SVSU, and BSD negligently failed to hire competent people to work with N.R. and that Mr. Buck and Ms. Connell were negligently supervised. Kathy Buck has moved for summary judgment pursuant to § 901a(b).

Kathy Buck's supervision of Clayton Buck and Laurie Connell was within the scope of her employment. However, Plaintiff has met her burden to show that there is a genuine dispute as to whether Ms. Buck exceeded the scope of her authority by hiring her son, Clayton Buck. Plaintiff cites SVSU and BSD's Policy # 4035, attached to her response as Exhibit L. The policy states: "the Board will not condone the hiring of anyone in a position where the person hired will be supervised or evaluated by a family member." Defendants argue that the policy does not prohibit the hiring of a family member. It is true that the policy uses the words "will not condone" rather than "prohibits," which could indicate Kathy Buck was acting within her authority when she hired Mr. Buck. However, the court concludes that there is a genuine dispute as to this material fact such that summary judgment as to this specific issue is not proper. Conversely, there is no evidence that Ms. Buck similarly acted outside the scope of her authority by assigning Ms. Connell to work with N.R. Thus, the court grants summary judgment in favor of Kathy Buck as to Count II on the basis of § 901a(b) immunity regarding her supervision of both employees and her hiring of Laurie Connell, but not on her hiring of Clayton Buck.

---

[5] The court has not gone through to determine which comments are within the scope of employment and which are not, as all comments fail to meet the prima facie elements of the case as explained in Section II(A) of this opinion.

### C. Applicability of § 901a to Mr. Buck and Ms. Connell in Count III

Next, Plaintiff in Count III alleges that Clayton Buck and Laurie Connell acted intentionally or with reckless disregard causing extreme emotional distress to N.R. As stated below regarding this IIED claim, it appears that the factual basis underlying this claim is the employees' comments, not their use of seclusions and restraints. Without examining each comment, the court need not decide whether individual comments were made outside the scope of employment because Plaintiff has failed to show that there is a genuine dispute as to whether she can meet all the elements of the IIED prima facie case as discussed below.

### D. Applicability of § 901a to Ms. Buck in Count IV

Plaintiff asserts the doctrine of respondeat superior in Count IV to allege the vicarious liability of Kathy Buck, SVSU, and BSD on each of the first three counts. Only Ms. Buck claims that § 901a protects her. The very definition of respondeat superior requires that the employee act within the scope of employment. See *Buxton v. Springfield Lodge No. 679*, 2014 VT 52, ¶ 13, 196 Vt. 486, 493 (quoting Black's Law Dictionary). Therefore, in order for Ms. Buck to be found vicariously liable, Mr. Buck and Ms. Connell had to have been acting within the scope of their employment. Thus, § 901a(b) must apply to Ms. Buck here. Accordingly, summary judgment as to Count IV regarding Ms. Buck is granted.

## II. No genuine dispute as to Plaintiff's failure to make out prima facie cases

Next, Defendants allege that they are entitled to summary judgment for the remaining counts for failing to state prima facie cases.

These remaining claims, not granted summary judgment above are:

    A. Negligent Infliction of Emotional Distress against Clayton Buck and Laurie Connell for allegedly making comments to and/or regarding N.R. (Count I);

    B. Negligent hiring against Kathy Buck for the hiring of Mr. Buck; and against BSD and SVSU for the negligent hiring and supervision of Mr. Buck and Ms. Connell (Count II);

    C. Intentional Infliction of Emotional Distress against Mr. Buck and Ms. Connell for making comments to and/or regarding N.R. (Count III); and

    D. Vicarious liability against BSD and SVSU regarding the theories alleged in the first three counts (Count IV).

For the following reasons, the court finds that Plaintiff has failed to support all the essential elements of the alleged counts with facts in the record. See *Hemond v. Frontier Commc'ns of Am., Inc.*, 2015 VT 66 (citing V.R.C.P. 56(c), (e)(2)).

## A. Count I (NIED) prima facie case

Regarding Count I, against Clayton Buck and Laurie Connell for allegedly making comments to and/or regarding N.R., Defendants have satisfied their burden of production by showing that Plaintiff does not have sufficient facts that create genuine issues as to material facts regarding all the essential elements of a NIED claim. Plaintiff has not demonstrated that there are genuine issues by pointing to specific material facts.

"To establish a claim for negligent infliction of emotional distress, a plaintiff must make a threshold showing that he or someone close to him faced physical peril." *Brueckner v. Norwich Univ.*, 169 Vt. 118, 125 (1999). The Vermont Supreme Court has not defined what it means to "face physical peril." In the broadest sense, it could mean to be physically present at the scene of the injury-causing event, as opposed to hearing about the event at a later date or viewing it contemporaneously on television. A better interpretation of this phrase is that a plaintiff must show that he or she faced a risk of physical harm based on the definition of these words. Webster's dictionary defines "peril" as "[e]xposure to the risk of harm or loss" and "[t]o expose to danger or the chance of injury." Webster's II New College Dictionary 838 (3d ed. 2005). "Physical" is defined as "[o]f or relating to the body as distinguished from the mind." *Id.* at 850.

While it might be theoretically possible for speech to expose a person to risk of bodily harm or injury, Plaintiff has not met her burden to persuade the court that any of the comments allegedly made by Mr. Buck or Ms. Connell could have exposed N.R. to risk of physical harm or injury. Indeed, the only response to Defendants' assertion that she has failed to meet all the NIED elements was to point to the use of restraints.[6] Therefore, it is within the court's discretion to consider this issue undisputed. See *Hemond v. Frontier Commc'ns of Am., Inc.*, 2015 VT 66 (citing V.R.C.P. 56(c), (e)(2)). Thus, the court grants summary judgment in favor of Clayton Buck and Laurie Connell on the remaining issue in Count I because Plaintiff has failed to show that there is a genuine dispute that N.R. faced physical peril, the threshold requirement to maintain a valid NIED claim.

## B. Count II (negligent hiring and supervising) prima facie case

In her Complaint, Plaintiff alleges that Defendants Kathy Buck, SVSU, and BSD owed a direct duty to N.R. to hire competent and qualified personnel and to appropriately supervise the personnel working with N.R. in order to ensure that services were being provided to him in a reasonable manner. Plaintiff further alleges that by breaching this duty, Defendants caused bodily injuries and mental suffering. The remaining issues in this claim are whether SVSU and BSD negligently failed to supervise Mr. Buck and Ms. Connell and negligently hired Ms. Connell, and also whether Ms. Buck was negligent in hiring her son to work with N.R. Defendants have met their burden of production for summary judgment by showing an absence of facts supporting all the elements of this claim. Therefore, it is Plaintiff's burden to persuade the court that there are facts supporting each element.

---

[6] As stated in section II(A) above, summary judgment was granted as to the use of restraints and seclusions based on § 901a immunity and the only remaining issue in Count I was based on the comments.

"[T]he tort of negligent supervision must include as an element an underlying tort or wrongful act committed by the employee. A wrongful act may well be a tort, but not necessarily." *Haverly v. Kaytec, Inc.*, 169 Vt. 350, 357 (1990). As with any negligence claim, a plaintiff must meet four basic elements: "a legal duty owed by defendant to plaintiff, a breach of that duty, actual injury to the plaintiff, and a causal link between the breach and the injury." *Ainsworth v. Chandler*, 2014 VT 107, ¶ 11, 197 Vt. 541 (quotations omitted). The duty owed here was "to anticipate and to guard against the human traits of his employees which unless regulated are likely to harm others." *Brueckner v. Norwich Univ.*, 169 Vt. 118, 127 (1999) (quoting Restatement (Second) of Agency § 213 cmt. g (1958)).

Plaintiff has failed to cite facts indicating that Defendants breached their duty to anticipate and guard against harmful traits of Mr. Buck and Ms. Connell.[7] In Plaintiff's response to this section of Defendants' motion, she begins by arguing Ms. Buck's hiring of her son violated Policy #4035. She then concludes by discussing the various employees' subsequent employment relationship with SVSU and BSD. There is no discussion with specific citations stating what human traits needed to be guarded against. See Pl.'s Resp. to Defs.' Mot. for Summ. J. at 18. Thus, because Plaintiff has failed to persuade the court with specific citations in the record that there is a genuine dispute that SVSU and BSD's supervision of Mr. Buck and Ms. Connell breached their duty, the court considers this issue undisputed. See, *Hemond v. Frontier Commc'ns of Am., Inc.*, 2015 VT 66 (citing V.R.C.P. 56(c), (e)(2)). Defendants also show that Mr. Buck and Ms. Connell were given training, which was not disputed by Plaintiff. Accordingly, summary judgment regarding negligent supervision is proper because Plaintiff has failed to persuade the court that there is a genuine dispute as to all the elements of this claim.

Next, Defendants have shown an absence of facts in the record indicating that Ms. Buck was negligent in hiring her son. Plaintiff has the burden of showing there are sufficient facts to create a genuine dispute as to the four negligence elements. Even if the court were to assume that the relevant trait to be guarded against was Mr. Buck's inexperience in working with children with autism, Plaintiff has failed to show facts in the record indicating a genuine dispute as to whether there was a breach.

Claiming Mr. Buck's hiring violated Policy #4035 is not evidence that Defendants breached the applicable duty here. Plaintiff is essentially making a negligence per se argument. However, negligence per se is only available where the statute or rule is designed to protect against the type of accident that allegedly occurred and only if the alleged victim is within the class of persons the statute or rule is designed to protect. See *Restatement (Third) of Torts: Phys. & Emot. Harm* § 14 (2010). Here, Policy # 4035 states that it is designed to protect against an appearance of a conflict of interest. There is no mention that the policy is designed to protect against bodily and emotional harm caused by inexperienced employees. Plaintiff has failed to articulate with specific citations to facts in the record how hiring Mr. Buck in violation of Policy #4035 violated

---

[7] Defendants argue that there is no duty here because the claim is based on "educational malpractice." The court addresses this argument later in this opinion as it concerns Count IV incorporating Count I. Because the court finds that Plaintiff failed to show facts regarding the breach element here, the court does not address the educational malpractice argument.

a duty owed to N.R. Thus, the court finds that there is no genuine dispute as to this material fact and that summary judgment is proper regarding the negligent hiring aspect of the claim.

Because Plaintiff has failed to demonstrate with specific citations to facts in the record that there is a genuine dispute as to whether Defendants breached their duties in hiring or supervising their employees, summary judgment is granted on the remainder of Count II.

### C. Count III (IIED) prima facie case

Next, the court must determine whether there is a genuine dispute regarding all the elements of Plaintiff's IIED claim against Mr. Buck and Ms. Connell for making comments to and/or regarding N.R. As an initial matter, the court must determine whether the basis for the claim is the February 13th comments and/or the use of seclusions and restraints. The complaint indicates the IIED claim is premised on both the comments and the implementation of the behavior plan because it incorporates all the previous allegations listed in her "Factual Basis" section. In the motion for summary judgment, Defendants show that there is no genuine dispute regarding both factual bases. In response, Plaintiff only mentions the comments. To the extent that the use of seclusions and restraints were the basis of this claim, the court grants summary judgment because Plaintiff has failed to meet her burden of persuasion by citing to specific facts in the record on this point.[8] However, the court must still consider whether the comments mentioned by the Plaintiff are a sufficient basis for the IIED claim.

This court must make "the initial determination of whether a jury could reasonably find that the alleged conduct satisfies all the elements of an IIED claim." *Fromson v. State*, 2004 VT 29, ¶ 14, 176 Vt. 395. The Vermont Supreme Court has further explained:

To avoid summary judgment on a claim for IIED, plaintiff must show that the [defendant] engaged in outrageous conduct, done intentionally or with reckless disregard of the probability of causing emotional distress, resulting in the suffering of extreme emotional distress, actually or proximately caused by the outrageous conduct. This is a heavy burden that requires plaintiff to show that the [defendant's] conduct was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decent and tolerable conduct in a civilized community and be regarded as atrocious and utterly intolerable. The standard for outrageousness is objective.

*Cate v. City of Burlington*, 2013 VT 64, ¶ 28, 194 Vt. 265 (internal quotation marks and citations omitted). In order to meet the "objective test for outrageousness: a plaintiff must demonstrate legal harm resulting from inflicted distress so severe that no reasonable person could be expected to endure it." *Baldwin v. Upper Valley Servs., Inc.*, 162 Vt. 51, 57 (1994). "[M]ere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" are insufficient to sustain an IIED claim. *Denton v. Chittenden Bank*, 163 Vt. 62, 66-67 (1994).

---

[8] However, the court notes that merely because conduct is permitted under Rule 4500 does not automatically mean that the conduct was not extreme and outrageous. See Restatement (Third) of Torts: Phys. & Emot. Harm § 46, cmt. e (2012) ("An actor can intentionally or recklessly cause severe emotional harm while exercising a legal right.").

The parties dispute what words were said, who made each comment, and what comments N.R. heard. Regardless, Plaintiff has failed to persuade the court that there is a genuine dispute as to whether N.R. suffered severe emotional distress caused by any comment. See of Restatement (Third) of Torts: Phys. & Emot. Harm § 46, cmt. g (2012) ("As with all questions of fact, the court first determines whether the evidence is sufficient to permit a jury to find the actor's conduct extreme and outrageous and the harm severe.").

Defendants cite to N.R.'s testimony as evidence that he was not harmed by the comments. In his deposition N.R. states: "They didn't say anything bad. They didn't say bad things about me." N.R. Dep. 11:9-10. When asked if any employees made comments that made him feel upset or bad, N.R. replied "no." Id. 11:11-13. Plaintiff argues that "[a]lthough these admissions would be dispositive of the entire case in ordinary circumstances, it is also true that N.R. cannot read or sign his deposition because he is a ten year old autistic child." Plaintiff cites generally to her expert's report, but does not provide a specific citation nor explain how having autism would make N.R. more likely to claim he was not injured, even if he did suffer emotional damage. Moreover, the court does not find any such statement in the expert's report that would bolster such a claim. Accordingly, the court agrees that these statements are credible evidence that there was no injury.[9]

Further, the court also concludes that there is no genuine dispute as to the injury and causation elements because Plaintiff has failed to put forth any facts in the record. Responding to Defendants' IIED section, Plaintiff makes the conclusory statement that "[a]t a minimum, a paraprofessional calling an autistic child 'a little [dumb-a--] with autism', by itself, constitutes outrageous conduct which was done intentionally or with reckless disregard of the probability of causing emotional distress, resulting in suffering of extreme emotional distress." Plaintiff does not cite any facts indicating that N.R. actually suffered "extreme emotional distress." Plaintiff may want the court to infer an injury from this comment, however, without more, such an inference is not reasonable. It is the Plaintiff's burden to demonstrate she has factual support for each element and not merely rely on conclusory allegations. Therefore, regardless of whether Mr. Buck or Ms. Connell made certain comments or whether N.R. heard those comments,[10] Plaintiff has failed to show there is a genuine dispute as to whether N.R. suffered "extreme" or "severe" emotional distress. Thus, the court grants summary judgment on Count III because Plaintiff has failed to persuade the court that there is a genuine dispute as to material facts on all the essential elements of her IIED claim.

---

[9] The court also notes that Plaintiff's expert has not opined that N.R. was injured by the comments; his opinion is limited to injuries he believes were caused by the use of seclusions and restraints. See Hasazi Dep. 183:3-7.

[10] Dr. Hasazi admits that if N.R. did not hear the comments, the comments would not have caused any injuries. Hasazi Dep. 176:7-13.

### D. Count IV (incorporating Counts I-III) prima facie cases

Finally, Defendants have moved for summary judgment as to Count IV. Only SVSU and BSD remain as Defendants on this claim. This court previously held in denying Defendants' motion to dismiss that Plaintiff properly asserted a vicarious liability claim based on Counts I-III. Therefore, the court interprets Count IV to mean that Plaintiff is re-alleging the same Counts I-III to be able to maintain a suit where § 901a(b) bars suit against individual employees and also against BSD and SVSU as employers under traditional notions of respondeat superior. Accordingly, the court must determine both whether respondeat superior is applicable as well as whether there are sufficient facts to establish all the essential elements of the three incorporated counts.

"Under the settled doctrine of respondeat superior, an employer or master is held vicariously liable for the tortious acts of an employee or servant committed during, or incidental to, the scope of employment." *Brueckner v. Norwich Univ.*, 169 Vt. 118, 122-23 (1999). In order to determine whether an employee's conduct falls within the scope of employment, Vermont has adopted the elements set forth in the Restatement (Second) of Agency § 229(1) (1958). *Id.* at 123. Therefore,

To establish that a servant's conduct falls within the scope of his or her employment, a plaintiff must demonstrate that the conduct:

(a) ... is of the kind the servant is employed to perform; (b) ... occurs substantially within the authorized time and space limits; (c) ... is actuated, at least in part, by a purpose to serve the master; and (d) in a case in which force is intentionally used by the servant against another ... is not unexpectable by the master.

*Doe v. Forrest*, 2004 VT 37, ¶ 15, 176 Vt. 476 (quoting *Brueckner*, 169 Vt. at 123). "The conduct of an employee falls outside the scope of employment if it is 'different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.'" *Id.* (quoting Restatement (Second) of Agency § 228(2)).

For the reasons explained below, the court finds that while the employees were acting within the scope of their employment, there is not sufficient evidence as to all the essential elements of the incorporated claims. Therefore the court grants summary judgment on this count.

### i. Count IV as it incorporates Count I

As stated previously, "[t]o establish a claim for negligent infliction of emotional distress, a plaintiff must make a threshold showing that he or someone close to him faced physical peril." *Brueckner*, 169 Vt. at 125. Then, if this threshold showing is met, the issue is whether plaintiff suffered a physical impact from an external force. *Id.*

If there has been an impact, plaintiff may recover for emotional distress stemming from the incident during which the impact occurred. If plaintiff has not suffered an impact, plaintiff must show that: (1) he was within the "zone of danger" of an act negligently

13

directed at him by defendant, (2) he was subjected to a reasonable fear of immediate personal injury, and (3) he in fact suffered substantial bodily injury or illness as a result.

*Id.* (internal citation omitted).

Here, there are two possible bases for the NIED claim: the February 13th comments and the use of restraints and seclusions.

### 1. NIED claim based on the comments

Without making specific findings as to what was actually said, by whom, and which comments were heard by N.R., it is possible to conclude that some statements were within the scope of employment (e.g. telling N.R. that they were going to call the police) and some comments (e.g. referring to him as a "[dumbas--]") were outside the scope of employment. Comments such as the one calling N.R. a "[dumba--]" were rooted in the employees' frustration, and cannot properly be seen as intending to advance SVSU and BSD's interests. See *Doe v. Forrest*, 2004 VT 37, ¶ 16. But even if all the comments were made within the scope of Mr. Buck and Ms. Connell's employment, N.R. never faced physical peril, the threshold requirement for a NIED claim. Thus, summary judgment is proper as to this issue within Count IV because Plaintiff has failed to show that there are sufficient facts to support all the essential elements of her claim based on the February 13th comments.

### 2. NIED claim based on use of restraints and seclusions

Next, the court must determine whether SVSU and BSD are vicariously liable for the secluding and restraining of N.R. Clearly, both techniques were within the scope of employment. They were disciplinary tactics of the kind that school employees were hired to perform; they occurred within school hours and within the school building; the employees utilized the tactics with the purpose of serving the municipalities by adhering to the behavior plan; and the force used in restraining N.R. was not "unexpectable" by the municipalities as it is authorized by Rule 4500.

Both the restraints and the seclusions meet the threshold "physical peril" requirement. Ms. Connell explained in her deposition that when N.R. became physically aggressive, such as raising a fist, they would restrain him using either a sitting or standing "basket hold." Connell Dep. 106:19-107:9. Ms. Reilly testified that she believed her son's bruises were caused by these restraints. J. Reilly Dep. 11:7. Thus, it is a reasonable inference that the employees exposed N.R. to the risk of bodily harm by holding onto an aggressive, struggling child, even if the restraint was not tight. While N.R. was in seclusion, there was still a risk he could physically harm himself before either employee could reach him. Accordingly, in both instances Plaintiff has shown sufficient facts indicating this threshold requirement has been met regarding the use of restraints and seclusions.

The court must then address whether SVSU and BSD are vicariously liable for any negligently inflicted emotional distress caused by either the use of seclusions or restraints.

14

Regarding the use of seclusions, there was no physical impact involved. Therefore, Plaintiff must show (1) N.R. was within the "zone of danger" of an act negligently directed at him by Mr. Buck and Ms. Connell; (2) he was subjected to a reasonable fear of immediate personal injury; and (3) he in fact suffered substantial bodily injury or illness as a result. Defendant asserts that there is no evidence that N.R. suffered bodily injury as a result of the seclusions. The burden is on Plaintiff to show that there is a genuine dispute that N.R. did suffer a substantial bodily injury as a result of the seclusions. Plaintiff has not met this burden. In response to Defendants' argument, Plaintiff simply states, "The behaviors exhibited by N.R. after attending school as detailed by Dr. Hasazi and his mother … along with those cited by the Defendant make out a case for determination of the weight of the evidence by the jury." Pl.'s Resp. to Defs.' Mot. for Summ. J. at 6. Nothing in this statement shows facts indicating that there were bodily injuries resulting from the seclusions.

In the section responding to Defendants' argument regarding Plaintiff's NIED claim, Plaintiff's response to the summary judgment motion never mentions bodily injuries caused by the seclusions:

The overuse of basket holds which involved substantial physical contact [that] at a minimum create[s] a question of fact. … [N.R.] was moved to a different school where his behaviors markedly improved which shows further proof and confirmation of the injuries that [N.R.] received as a result of the Defendants' actions.

*Id.* at 14. Plaintiff goes on to cite Dr. Hasazi's report which mentions "suffering," but does not clarify whether that suffering was physical or mental.[11] Therefore, the court finds that Plaintiff has not met her burden regarding the essential element of showing bodily injuries caused by the seclusions. Summary judgment is proper regarding the claim that SVSU and BSD are vicariously liable for any negligently inflicted emotional distress caused by the use of seclusions.

Regarding the use of restraints, there was physical impact involved. Thus, Plaintiff may recover if there are facts supporting the standard elements of all negligence claims: duty, breach, causation, and injury.

Defendants assert that there is no applicable duty here. This argument goes to the very heart of this case. While conceding that school municipalities have a duty to protect students from intentional torts such as assault and battery under 16 V.S.A. § 834(a), they argue that there is no duty owed to parents or students to reasonably implement an effective behavior plan. They say that to impose such a duty of care would essentially make them liable for "educational malpractice" – a theory of liability that has not been addressed in Vermont, but has been rejected in other states. See Defs.'s Mot. Summ. J. at 22.

_____

[11] In Ms. Reilly's deposition, she states that N.R. came home with bruises before and after attending the programming at the church in October 2012. J. Reilly Dep. 9:20-11:4. These bruises are the only physical harm Plaintiff contends N.R. suffered. *Id.* 11:7. However, her brief does not cite facts in evidence to show that these bruises were caused by the seclusions. In fact, she believed they were caused by the use of restraints. *Id.* 11:7.

It is evident that Plaintiff believes that Defendants are liable for not ending the use of restraints and seclusions despite observing N.R.'s behavior getting worse.  See J. Reilly Dep. 34:21-25.  Plaintiff's expert believes that some use of seclusion and restraints was appropriate to address N.R.'s behaviors; however, he also believes that the employees "should have figured out another approach that didn't worsen his behavior, causing the need for increased seclusion and restraints."  Hasazi Dep. 183:18-21.

The court concludes that school municipalities owe a duty of care under these circumstances.  In enacting 16 V.S.A. § 834(a), the Vermont Legislature imposed on school municipalities a duty of care to their students.  *Id*. ("Each school district and its employees owe its students a duty of ordinary care to prevent the students from being exposed to unreasonable risk, from which it is foreseeable that injury is likely to occur.").  The express language of the statute does not limit the scope of the liability to injuries caused by intentional torts.  Moreover, the Vermont Supreme Court has previously discussed this statutory duty using broad language.  See *Edson v. Barre Supervisory Union No. 61*, 2007 VT 62, ¶¶ 10-11, 182 Vt. 157 ("[W]here school administrators or teachers fail to exercise ordinary care in supervising students, they may be held liable to the extent their acts or omissions are the proximate cause of a student's injury."); see also *Brueckner v. Norwich Univ.*, 169 Vt. 118, 122-26 (1999) (holding that a school may be held vicariously liable for claims under both assault and battery theories as well as a NIED claim).  Thus, SVSU and BSD owed N.R. a duty of care to use restraints in a reasonably prudent manner to prevent him from being exposed to unreasonable risk of injury, to the extent that the type of injuries N.R. suffered were foreseeable.

Defendants' citation to *Sellers v. School Board of the City of Manassas*, 960 F. Supp. 1006 (E.D. Va. 1997), and the line of cases beginning with *Peter W v. San Francisco Unified School District*, 60 Cal.App.3d 814, 131 Cal. Rptr. 854 (1976), is unpersuasive for several reasons.  First, § 834(a) refers to the duty in general terms.  Second, this case does not fit neatly into any of the categories defined in *Sellers* because the use of restraints was a disciplinary technique that was part of a broader behavior plan designed to motivate N.R. to learn.  See *Sellers*, 960 F. Supp. at 1013 (listing categories of educational malpractice claims).  While the alleged negligence could fall under *Sellers*'s third category, the negligent failure to treat a student's disability, the disciplinary nature of these acts distinguishes this case.  Third, the court does not believe that this conclusion will open the floodgates of litigation, a dominant concern in this line of cases.  See *Peter W*, 60 Cal.App.3d at 825.  Whether to impose a duty is a question of fairness depending on a variety of public policy considerations and relevant factors.  *Deveneau v. Weilt*, 2016 VT 21, ¶ 8.[12]  The court determines that it is fair, given these facts, to conclude that § 834(a) applies.

Defendants assert that if there was a duty imposed, it would be a professional standard of care akin to the duty in medical malpractice suits.  They claim this is significant because a professional standard of care must be established by expert testimony.  See *Wilkins v. Lamoille Cnty. Mental Health Servs., Inc.*, 2005 VT 121, ¶ 16, 179 Vt. 107.  However, the court concludes that this is not a professional standard of care because § 834(a) only imposes an *ordinary*

---

[12] Available at:
www.vermontjudiciary.org/LC/Supreme%20Court%20Published%20Decisions/op14-330.pdf.

16

standard of care, not a heightened professional standard. Therefore, no expert is needed for the element of duty.

Next, Defendants implicitly argue there is no genuine dispute as to the breach element because the use of restraints is authorized under the Vermont Agency of Education Rule 4500 and Plaintiff has not shown any facts indicating there is a genuine dispute that the use of restraints violated Rule 4500. As stated above, the court agrees that there is no factual dispute in the record indicating Defendants violated Rule 4500. However, the general rule in tort law is that compliance with a rule is merely evidence of non-negligence; it does not preclude a finding of negligence where a reasonable actor would have taken precautions in addition to those mandated by the rule. See Restatement (Second) of Torts § 288C (1965); Restatement (Third) of Torts: Phys. & Emot. Harm § 16 (2010). While showing compliance with Rule 4500 is sufficient to meet Defendants' initial burden, Plaintiff's failure to rebut this showing is not fatal to her claim.

The court concludes that Plaintiff has shown enough facts to create a genuine dispute as to whether Defendants breached their duty. The record shows that SVSU's and BSD's employees were aware that N.R.'s problem behaviors were getting worse, or at least were not improving, and they continued to use restraints. Thus, a jury should determine whether Defendants' conduct fell below the ordinary standard of care required under the circumstances.

Next, the court must determine if there are genuine disputes as to the causation and injury elements. Defendants raise two arguments as to these elements. First, they contend that Plaintiff has not shown what the injuries specifically were or that they were caused by Defendants. The court agrees that Plaintiff's interrogatory answers merely repeated the allegations in her Complaint. They did not list the specific injuries caused by the actions of the employees. If that were all she did, summary judgment would be granted on this ground. However, the court finds that Plaintiff could meet her burden by pointing to Dr. Hasazi's report and deposition, which she did. See Pl.'s Resp. to Defs.' Mot. for Summ. J. at 6.

Defendants' second argument is that Dr. Hasazi's opinions are inadmissible and cannot be considered because they do not meet the requirements of V.R.E. 702 and *Daubert*. Under V.R.E. 702, a qualified expert may testify as to his or her opinion if: "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Vermont Rule 702 is derived from Federal Rule 702 and Vermont courts follow the federal *Daubert* analysis for determining whether to admit or exclude expert testimony. *985 Assocs., Ltd. v. Daewoo Elecs. Am., Inc.*, 2008 VT 14, 183 Vt. 208. *Daubert* and V.R.E. 702 establish a flexible standard, requiring only that the proposed expert testimony be both relevant and reliable in order to be admissible. *Id.* ¶ 6. The key factors to consider include:

- Did the expert base his or her opinions on prior, independent research, or were the opinions generated solely for use in litigation?

- If the testimony arose from litigation work, are the theories underlying the opinions generally accepted within the relevant scientific community?

- If the theories are not "generally accepted," did the expert at least subject the theories to peer review and publication?

- If the expert did not subject his work to peer review and publication, was the expert employing a "standard" scientific methodology in arriving at his or her conclusions?

- If the expert did not use an accepted methodology, was the theory tested and/or was it susceptible to testing by others?

- If the theory was, or could be, tested, what was the known or potential rate of error in the expert's analysis?

Damian D. Capozzola, *Expert Witnesses in Civil Trials* § 2:17 (2015).

In conducting this analysis, a trial judge acts as a gatekeeper; screening expert testimony in order to ensure it is reliable and helps to resolve the issue in dispute. *Daewoo*, 2008 VT 14, ¶ 6. The primary focus of the court's analysis is on "excluding 'junk science' – because of its potential to confuse or mislead the trier of fact – rather than serving as a preliminary inquiry into the merits of the case." *Id.* ¶ 10. An opinion resting on "nebulous methodology" is unhelpful to the fact finder and is inadmissible. See *Estate of George v. Vt. League of Cities & Towns*, 2010 VT 1, ¶ 15 187 Vt. 229. It is the proponent of expert testimony who has the burden to establish the testimony's reliability. *Daewoo*, 2008 VT 14, ¶ 13.

Defendants argue that Dr. Hasazi's fails the *Daubert*/V.R.E. 702 test on the ground that his methodology does not meet the standards set forth in the Handbook for Forensic Psychology and the American Psychological Association's Specialty Guidelines for Forensic Psychology. They claim that Dr. Hasazi's failure to compile and analyze the number and frequency of N.R.'s problem behaviors for time periods before, during, and after N.R. was at BennEl violates the Handbook's requirement that the evaluator collect data using a comprehensive, relevant, and valid collection method and use an appropriate interpretation method. They add that this is significant because N.R. had these types of problem behaviors and experienced anxiety before attending BennEl. Defendants also assert that Dr. Hasazi's failure to consider behavior tests completed by Ms. Reilly, N.R.'s aunt, and another school employee who worked with N.R. after these events indicates that Dr. Hasazi ignored data undercutting his opinion, a violation of the Specialty Guidelines. Finally, Defendants allege that Dr. Hasazi's failure to administer the Youth Self-Report test and to review and evaluate school employees' and consultant's affidavits, as well as a video-recorded interview with N.R., show Dr. Hasazi failed to collect data from collateral sources. In sum, Defendants contend that Dr. Hasazi's methodology is nebulous and therefore should be excluded.

In response, Plaintiff simply states that these arguments go to the weight of the evidence, not to the admissibility of Dr. Hasazi's opinion. Her entire reply is as follows:

[An e]valuation by a clinical child psychologist relative to an autistic child in which the expert has great expertise hardly constitutes 'junk science'. These types of conclusions are

made every day in tort cases by health care professionals as to whether a Plaintiff has or has not been injured as a result of negligent acts.

Pl.'s Resp. to Defs.' Mot. for Summ. J. at 6.

Such a blatant conclusory statement is not sufficient to meet Plaintiff's burden, as the proponent of Dr. Hasazi's expert opinion, to establish the reliability of that opinion. A proposed expert's relevant experience is not sufficient; the expert's methodology in reaching his or her opinion must be reliable. While it could be the case that such statistical analysis is not necessary or that Defendants' interpretation of the Handbook and Specialty Guidelines is erroneous, Plaintiff has not cited to any caselaw, scholarly article, or even an affidavit from Dr. Hasazi to explain why Defendants' argument is incorrect. Dr. Hasazi stated in his deposition that he did not believe it was necessary to compare sets of data in order to establish causation. See Hasazi Dep. 55:14-20. However, because Defendants met their burden by citing specific guidelines, Plaintiff had the burden to show that Dr. Hasazi's methodology met these or other relevant guidelines or to explain in a non-conclusory manner why compiling and analyzing data sets for the before/during/after time periods was unnecessary. Accordingly, because Plaintiff has failed to meet her burden to demonstrate that Dr. Hasazi's opinion is reliable, it cannot be used to meet the causation or injury elements.

Causation and injury are both essential elements to this claim. Plaintiff has not pointed to other credible facts in the record to demonstrate that N.R. suffered injuries caused by Defendants' conduct. Therefore, Plaintiff has failed to carry her burden to show there is a genuine dispute as to the causation and injury elements. Thus, because Plaintiff has failed to show a genuine dispute as to facts supporting all the essential elements of her claim, summary judgment as to this issue within Count IV is proper.

### ii. Count IV as it incorporates Count II

Next, Plaintiff claims that SVSU and BSD provided negligent supervision of Clayton Buck and Laurie Connell and negligently hired Laurie Connell. For negligent supervision claims, Vermont follows § 213 of the Restatement (Second) of Agency, which provides:

A person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligent or reckless … in the employment of improper persons or instrumentalities in work involving risk of harm to others: in the supervision of the activity; or … in permitting, or failing to prevent, negligent or other tortious conduct by persons, whether or not his servants or agents, upon premises or with instrumentalities under his control.

*Haverly v. Kaytec, Inc.*, 169 Vt. 350 (1999) (quoting Restatement (Second) of Agency § 213 (1958)). "Pursuant to § 213, liability exists only if all the requirements of an action of tort for negligence exist." *Id.* These requirements or elements are: "a legal duty owed by defendant to plaintiff, a breach of that duty, actual injury to the plaintiff, and a causal link between the breach and the injury." *Ainsworth v. Chandler*, 2014 VT 107, ¶ 11, 197 Vt. 541 (quotations omitted). In a negligent supervision case, a supervisor has the duty "to anticipate and to guard against the

19

human traits of his employees which unless regulated are likely to harm others." *Brueckner v. Norwich Univ.*, 169 Vt. 118, 127 (1999) (quoting Restatement § 213 cmt. g). As stated in the analysis section regarding Count II, Plaintiff failed to cite facts indicating that Ms. Buck breached her duty to anticipate and guard against harmful traits of Mr. Buck and Ms. Connell. Accordingly, Plaintiff has failed to meet her burden of persuasion in this case. Thus, summary judgment on this issue is appropriate.

Plaintiff's claim against SVSU and BSD for the alleged negligent hiring of Ms. Connell similarly must fail because Plaintiff has failed to make specific citations to facts in the record showing that there is a genuine dispute that there was a breach of duty. Thus, summary judgment on this part of Count IV is proper because there is no genuine dispute as to whether Plaintiff has facts to meet all the elements of negligent supervision and hiring.

### iii. Count IV as it incorporates Count III

The final claim incorporated into Plaintiff's Count IV is that SVSU and BSD are liable for their agents' intentional infliction of emotional distress on N.R. As stated above, Count III only alleged liability regarding Mr. Buck and Ms. Connell's comments to and/or regarding N.R. Just as in Count III, Plaintiff's failure to cite specific facts in the record showing that there is a genuine dispute as to whether N.R. suffered severe emotional distress caused by the comments is fatal to this claim. Therefore, summary judgment is proper as to this part of Count IV.

### iv. Count IV conclusion

In sum, because summary judgment is appropriate as to all the incorporated issues in Count IV, the court grants Defendants SVSU and BSD summary judgment as to Count IV as a whole.

### **Order**

Based on the reasoning and conclusions set forth above, WHEREFORE, it is hereby ORDERED that Defendants' motion for summary judgment is hereby GRANTED as to Plaintiff's claims I-IV as to all Defendants. Those claims are hereby DISMISSED. Defendants may submit an order of judgment pursuant to the Vermont Rules of Civil Procedure.

Electronically signed on March 31, 2016 at 04:30 PM pursuant to V.R.E.F. 7(d).


John W. Valente
Superior Court Judge